**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|

**UNITED STATES OF AMERICA,**

                                   |     **CRIMINAL INDICTMENT NO.:
1:20-CR-196-LMM-JSA-7**

**v.**                                |

**MARIELA HERNANDEZ,**           |

       **DEFENDANT.**                  |

**<u>BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS
ILLEGALLY OBTAINED EVIDENCE</u>**

    COMES NOW Defendant, by and through undersigned counsel and files this, her <u>Brief in Support of Motion to Suppress Illegally Obtained Evidence</u>, and in support of said motion shows this Honorable Court the following:

**I.    STATEMENT OF FACTS**

    The March 18, 2020 traffic stop that is the subject of this motion was conducted by Trooper Anthony Munoz of the Georgia State Patrol. (T.78., T.91). He was not on routine patrol at the time of the stop however, instead, Munoz stopped the vehicle at the direction of DEA Special Agent Andrea Boone, as part of her ongoing drug investigation of Ismael Guerrero-Moya. (T.78-79, 91-92).

    Andrea Boone's investigation was initiated in 2019, after Guerrero-Moya was intercepted on a contraband cellular phone within Ware State Prison. (T20., L18. 13-25). Agents obtained a wiretap for the phone and intercepted communications Guerrero-Moya

1

had with co-defendant Maria Cornejo, among others[1]. (T21., L21-25; T.22, L1-2). On March 17, 2020, agents intercepted a call between Guerrero-Moya and an unidentified male, (UM637), which they "believed" indicated that Guerrero was going to coordinate a drug pick up the following day. (T.41, L21-23). Although she was in possession of specific information regarding the pick-up, Boone did not get a warrant to detain and search the target vehicle or to arrest its driver, because she was without probable cause to do so based on the information she had from the call.

Munoz's patrol vehicle was ostensibly taken out of routine State Patrol service and detached to Boone's interdiction team that day, because it was anticipated a traffic stop would be necessary in hopes that "probable cause" could be developed incident thereto, to search the target vehicle for drugs. (T.62, L3-9). Notably, Trooper Munoz indicated in his incident report regarding the eventual stop and search of the target vehicle that the purpose of his report was not to objectively document what occurred, in accordance with his POST training[2]. Rather, it was

---

[1] Defendant Hernandez was never intercepted on the wiretap and was not known to the government or the drug investigation until the traffic stop that is the subject of this motion.

[2] The Court can take judicial notice that: **"The incident report is for communication.** It is not intended to persuade, impress, or convince anyone regarding an incident. **All the report does is report!"** Report Writing 4.9-1, State of Georgia Peace Officer Standards and Training Counsel Manual.

drafted "solely to assist the prosecuting authority" in this case. (T.113-114).

Nonetheless, prior to the March 18, 2020, traffic stop, Trooper Munoz was advised by Boone at the group pre-operation meeting, that the DEA was investigating an *unknown* drug trafficker and that his authority, as a Georgia State Patrolman, was going to be used to detain their target vehicle in a traffic stop. (T.77-78, T.91, L11-25).  Munoz was told to stand by in the Clayton County, Rex, Georgia area until the DEA was ready for him to act at their direction. (T.92, L10-11). He was to be alerted through WhatsApp chat[3], which the DEA takedown team was using, primarily, to communicate that day.  Prior to the stop, Munoz was advised that the target vehicle was going to be a Ford Fusion. (T. 92, L18 – T.93, L7).

Throughout the day of the operation the Ford Fusion Defendant was driving at the time of the stop, was being surveilled by state and federal agents. (T. 115, L24 – T. 116, L1-4). In the WhatsApp chat log, which memorialized the written communications among the agents as they coordinated their efforts that day, it was reported to Munoz, and others, that while the Ford Fusion was under surveillance, one agent saw a huge box ***being removed*** from it:

> "[3/18/20, 4:27:21 PM] Daman Grimwade: Walked in with Huge box she got out of the trunk." (Exhibit 5, 3/18/20, 4:27:21pm),(T. 116, L5-11).

---

[3] A texting app.

However, after seeing the box taken out of the vehicle, no officer or agent reported anything about a box, or any other container, ever being placed **back into** the car.  In fact, 39 seconds **after** Agent Henao told Munoz and others, "Guys stay with the fusion and the Honda, please attempt to stop both", (Exhibit 5 3/18/20, 4:29:54 PM), he specifically inquired as to whether any of the agents ever observed anything put back into the vehicle, after the box had been removed therefrom:

> "**[3/18/20, 4:30:33 PM] Miguel Henao: Stay with that car [the Ford Fusion] until it gets pulled over. Did anything go into into [sic]it**". Exhibit 5, 3/18/20, 4:30:33 PM).

None of the officers surveilling the Ford Fusion ever responded to Heano's inquiry and, as a result, the detaining officers had no evidence at the time the target vehicle was stopped that there was suspected contraband therein.

After the above referenced exchange, Munoz was told that the task force was ready for him to stop the target vehicle. (T.95, 10-13), (Exhibit 5, 3/1/20 4:29:54 PM). Once he identified the vehicle traveling on the roadway, he fell in behind and followed it, hoping to observe a traffic violation. (T96. L3-13).

It is undisputed that Mariela Hernandez had never been identified or discussed in any of the intercepted Guerror-Moya calls leading up to the stop of the target vehicle. (T.73-T.74, L9-L17) Further, according to the testimony at the suppression hearing, it was clear that **no drugs** had previously been intercepted

based on the wiretap of Guerrero-Moya's phone[s]. (T.73, L2-5) Be
that as it may, however, Munoz testified that he was going "to
stop [the target vehicle] no matter what", (T.108, L16-20), because
he had the legal right to do so based upon what he had been told
by Boone.  That is to say, the target vehicle was going to be
stopped [by Munoz] and searched "regardless" of the speeding
violation, because it was Munoz's belief that he "didn't need the
speeding charge to stop and ask her if there were drugs in the
car." (T.115, L3-9).

Despite having admitted that the vehicle was going to be
stopped regardless of whether the driver committed a traffic
violation, Munoz claimed at the suppression hearing he pulled the
vehicle over for going 45 to 50 miles per hour in a 40 mile per
hour zone. (T.96, L11-20). This alleged speeding violation, for
traveling only 5 miles per hour over the limit, was not detected
by laser or radar, nor was it captured on video. Although, Munoz
testified his vehicle's dashcam was in working order and that he
had no difficulty recording his interactions with the occupants of
the target vehicle after the stop. (T.97, L19 – T.98, L5).
Moreover, Munoz testified that had he turned on the dashcam camera
in his vehicle manually, which he could do at any time, or engaged
his emergency equipment upon seeing the speeding infraction, that
the camera would have engaged and immediately back-tracked 15
seconds, assuring that the alleged speeding violation would have

5

been memorialized. Rather than doing so, however, Munoz testified he let the target vehicle stop at a traffic light and then for it proceed through the intersection before engaging his emergency equipment, thereby ensuring that the purported speeding infraction would not be captured. In this regard it must be noted that according to the testimony at the suppression hearing, although the target vehicle had been followed throughout the day by the investigating agents, no other traffic violations were alleged to have occurred during that time. And, according to Munoz, he did not observe any other traffic violations by the target vehicle prior to the stop. (T. 96, L24-25).

After the target vehicle was detained, Munoz encountered the two occupants of the vehicle. He had both exit the car immediately and then pulled the driver's side door open all the way after the car was empty. (Exhibit 1 - Munoz Video). According to Munoz, neither the driver nor the passenger of the vehicle was free to leave, although the passenger was not alleged to have done anything wrong. And, according to Munoz, they were also not allowed to use their phones while his investigation proceeded. (T.99 L7-25; T.117, L10-12).

Munoz identified the driver of the Ford Fusion as Mariela Hernandez. (T.100, L1-2). Though she did not provide a license, she did give Munoz her name, date of birth, and a picture of her passport that was on her cell phone. (T.100, L15-25). Munoz also

6

ran her fingerprints and confirmed her identity. Id.  The other occupant of the vehicle was identified as Maria Cornejo, who had a valid driver's license on her person. (T.101, L17-24).

Because he was admittedly stopping the vehicle "no matter what" based upon what he had been told by the DEA about the suspected drug activity, once Munoz got both occupants out of the vehicle and identified them, he abandoned the purpose of the traffic stop, a "speeding" violation and started asking them drug interdiction questions. He inquired about their tattoos and asked questions about contraband, and then he asked both the driver and passenger for consent to search the vehicle for drugs. (T.102, L11-12; T. 114, L12-24).  Ms. Hernandez indicated the vehicle was not hers, and that she could call the owner for consent, but Munoz would not allow it.  (T.102, L14-16).

Meanwhile, because the purpose of the stop was to search the vehicle for drugs, Munoz already had K-9 handler Kendall Stanley and his dog Ozon with him when the vehicle was stopped. (T.98, L18-25).  Stanley heard the conversation about whether the occupants of the target vehicle would consent to a search. And, because the officers "didn't want to beat around the bush, he just went ahead and grabbed Ozon and deployed his K-9" to conduct a free air search of the vehicle. (T.102, 17-23).

In his testimony about Ozon, according to Stanley, the dog cannot identify illegal drugs, but has undergone training whereby

7

he is incentivized with "gifts" if he alerts to the odor of certain illegal narcotics. (T.145, L19-21, T.149, L2-25).  As to his reliability Stanley advised that Ozon has had both false positives – alerting when drugs are not present- as well as false negatives – not alerting when drugs are present - during his training and deployment on the job. (T.147, L.13-19).  Additionally, his training never involved scenarios where Ozon would be deployed, but there were no drugs to find. (T. 148, L2 – T.149, L1).  In response to the Court's inquiry in this regard, Stanley also admitted that, without speculating, he could not recall **any** instances that Ozon **didn't alert** in an actual K-9 deployment during a traffic stop. (T. 157, L14-21).

Nonetheless, according to Stanley, immediately prior to Ozon's deployment here, Stanley took him aside to relieve himself in the grass. When he finished, Stanley signaled his dog to find the "gift", meaning to search for contraband, and he walked Ozon to the car. Rather than walk around the outside of the car and conduct a free air search of its exterior, however, Ozon immediately went ***inside the vehicle,*** through the driver's side door that Munoz had pulled open after Hernandez had exited the vehicle. (Exhibit 1 – Munoz Video, Exhibit 2 – Stanley Video). (T.154, L1-15).  Stanly advised that upon entry into the vehicle Ozon gave a positive alert for the odor of contraband, indicating that the dog alerts either by sitting, standing and staring, or

8

laying down. (T. 156, L4-10).  In this instance, Stanley avers that Ozon "stood and stared" to indicate that he detected an odor of drugs inside the vehicle; but added that Ozon also "locks up" i.e., stands and stares, if he sees a bird.  (T.156, L11-16).

After Ozon was observed standing and staring with his head inside the car, Stanley put him away without walking him around the vehicle to see if he would alert to the exterior, as would be the process with a typical free air search. (T. 156, L 22-25) And, in this regard, Stanley testified he could not speculate whether Ozon would have alerted to the exterior of the car in an actual "free air" sniff of the vehicle. (T. 157, L4-12). It is unclear from the dashcam video and discovery received to date whether there were any birds in the vicinity of the target vehicle at the time of Ozon's alert.

After Ozon's purported alert on the vehicle, Munoz searched it and found suspected methamphetamine in the trunk. (T.144, L1-2). Thereafter, Munoz advised Hernandez she was in big trouble and, without advising her of her rights under *Miranda,* began asking Defendant questions about, her control of the vehicle; what is in various bags; where she got the car; whether she is a drug courier; whether she was paid to courier drugs; and whether she was threatened or coerced by someone to be a courier.  Defendant denied that she was a courier or that she knowingly transported anything illegal. (Exhibit 1, ~57 minutes).  In response, Munoz tells her

9

not to lie to him, that this is the time to be honest, that she is going to go away for a long time, and that her kids will have kids by the time she gets out of prison. (T.119, L.2-11). Munoz also stated to Defendant on several occasions that if she provided information about the drugs discovered in the vehicle that Hernandez could help herself. (T.123, L16 – T.124, L1). Despite the intensity and length of the interrogation, Munoz admitted that at no time did he ever advise Hernandez of her *Miranda* rights. (T. 120, L2-5).

Eventually, Ms. Hernandez was handed off to agent Henao for further interrogation which was recorded. (Exhibit 10). Agent Henao handcuffed Ms. Hernandez and placed her in the passenger seat of one of the unmarked vehicles. (T.169, L22 – T.170, L1), (T.170, L5-12). Approximately an hour into the stop, Defendant is read, for the first time, her Miranda rights. (T. 175, 13-22). At no point thereafter is Defendant asked if she waived her rights to remain silent or whether she wanted to speak to a lawyer before answering ***any more*** questions.

Instead, after advising Defendant of her rights, Henao asked whether she was willing to continue answering questions. In response Hernandez advised, "I don't think there is much that I can answer because there is not much that I know." (Exhibit 10; T.177, L.6-12; T.194, L11-13). Henao then told her, whatever information she was willing to provide, "*could assist her down the*

10

*road*." (T.194, L17-21) and would "be beneficial for her if she was truthful". (T. 195, L5). He continued asking her questions about her involvement in the case and she continued responding to his questioning. Whenever Defendant became hesitant to answer a particular question, Henao would tell her that the answers to his questions were not to help him, they were to **help *her*,** since the investigation was at the federal level and that she was detained with more than ten kilograms of methamphetamine. (T. 197, 10-22; Exhibit 10). In response to the continued, patent offers of benefit made to her throughout her interrogation by the various law enforcement officers who questioned her, Defendant continued to answer them until the interviews concluded.

## ARGUMENT AND CITATIONS OF AUTHORITY

### The Traffic Stop

Trooper Munoz did not have probable cause to stop and search the target vehicle without a warrant.  Instead, law enforcement had arranged for a traffic stop based upon their interpretation of wire-tapped phone calls regarding the vehicle Defendant was driving. In essence, this stop was orchestrated based upon a "hunch" that drugs were being transported in the target vehicle at the time of the stop.  Moreover, the surveillance team following the Ford Fusion driven by Hernandez that day, had witnessed and communicated to the other law enforcement officers that the only package known to have been in said vehicle had been removed when

11

it stopped at another location and no one had witnessed anything going back into it prior to the stop at issue here.

Clearly then, assuming arguendo that probable cause existed to believe that drugs were being transported on March 18 based upon the intercepted calls, it evaporated when the only package known to have been in the vehicle based upon surveillance was removed therefrom. Therefore, because there was no longer a reasonable suspicion that contraband was in the vehicle, law enforcement had no probable cause to search it at the time of the stop.

Further, although Munoz admitted he was stopping the Ford Fusion "no matter what" and that he did not need the traffic violation to make the stop and search it, if the basis for stopping the vehicle was the traffic stop, when he abandoned it and commenced a narcotics investigation he violated Defendant's rights to privacy under the Fourth Amendment to the United States Constitution. *Rodriguez v. United States* 575 U.S. 348 (2015) Clearly, the Fourth Amendment does not countenance any lengthening of a traffic stop for reasons unrelated to its mission, an analysis which can only be determined by observing "what the officer actually did [during the stop] and how he did it."

Of critical import to this holding was the Supreme Court's finding that the District Court disregarded in its examination of the facts, the time elapsed from the beginning of the stop to when

12

the detaining officer began asking questions unrelated to its mission and began asking those related to: drugs, tattoos, gang affiliations, and whether contraband may have been in the vehicle. All without a legitimate basis for the questioning in that regard. See also, *Arizona v. Johnson*, 555 U.S. 323 (2009).

Here, although Munoz stopped Defendant's car because he believed it was transporting drugs and was told to do so, he identifies an allegation of speeding as the underlying traffic violation for the stop. And as a result, he was left to investigating that infraction with the driver immediately after the stop. Unfortunately, the alleged violation was barely even broached before Munoz dove into his interrogation of Defendant about drugs. Other than telling Defendant she was stopped for speeding, Munoz did not discuss or follow up at all on the traffic violation during his interaction with Defendant. Instead, while confirming her identification on the computer and via fingerprint analysis, he spends all of his time questioning Defendant about extraneous matters, such as where she was going and where she was coming from.  Nine minutes into the stop he is asking her if she has anything illegal in the vehicle (Ex. 1, ~9 minutes) and what her tattoos mean (Ex. 1, ~9:40). Twelve minutes into the stop, Munoz is asking if he can search the vehicle, whereupon consent is denied. And then, nearly fifteen minutes into the stop he has

Stanley deploy Ozon, ostensibly to do a "free air" search of the vehicle in furtherance of the drug investigation.

In fact, even though she did not have a driver's license on her person and identified herself via a photo of her passport on her phone at the inception of the stop, it is not until 27 minutes and 40 seconds into the stop, after the contraband is discovered in the vehicle, that Munoz asks Defendant to re-open her phone and allow him to get a photo of the passport she presented to identify herself. And, it wasn't until 33 minutes and 5 seconds into the stop, 5 minutes and 25 seconds after getting the photo of the passport from her phone, that Munoz attempts to confirm Defendant's biographical information, including her address, birthday, height, hair and eye color. As a result, any suggestion that her identity was of concern prior to the illegal search of the target vehicle is without merit.

In examining the propriety of such tactics, the *Rodriguez* Court changed the approach to be used in evaluating the permissible scope of a traffic stop. Previously, the focus was on the overall duration of the stop in determining whether a suspicionless dog sniff, *Illinois v. Caballes*, 543 U.S. 405 (2005), or irrelevant questioning regarding matters unrelated to the basis for the stop, *Arizona v. Johnson,* 555 U.S. 323 (2009), unconstitutionally expanded them into an illegal seizure. Dicta in these cases foreshadowed the *Rodriguez* holding. In *Caballes*, 543 U.S. at 407,

14

the Court stated "a [] seizure that is justified solely by the interest in issuing a warning ticket to the driver, [or a citation for a non-moving violation], can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." In *Johnson,* 555 U.S. at 333, the Court stated that "[a]n officer's inquiries into matters unrelated to justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."

In clarifying these prior decisions, the *Rodriguez* Court held that the "[a]uthority for the [initial] seizure ends when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." This holding confers two limits on the scope of a traffic stop. First, a court must determine when the "tasks tied to the traffic infraction are . . . completed", while at the same time considering whether the officer extended the traffic stop for some unrelated and unjustified reason. Second, it must be determined whether those tasks "reasonably should have been . . . completed" sooner. In answering these questions, the *Rodriguez* Court determined that the lower court does not have to consider whether the officer acted expeditiously in concluding the traffic investigation. Id. Instead, it could ignore everything the officer did during the traffic investigation and even the overall duration of the stop, and simply consider what happened after the

investigation of the traffic violation ended, a point in time that usually corresponds to when the officer gives the ticket or warning to the driver.

More recently the answer to these questions were expressed by the Eleventh Circuit in *Campbell* v. U.S., 970 F.3d 1342 (Aug. 2020), where the Court reaffirmed, generally, that an officer may not unlawfully prolong a traffic stop to investigate other crimes, absent reasonable suspicion. In *Campbell*, the officer initiated a traffic stop and proceeded to ask the driver several questions that were completely unrelated thereto, including Campbell's: (1) travel itinerary; (2) work history; and, (3) whether he was transporting contraband. The Court found that these questions were not related to the traffic violation and instead were aimed at the possibility of general criminal behavior which unnecessarily extended the stop. The Campbell decision was not a revelation in this regard, and in fact relied upon binding precedent which had long been established, that if an officer unlawfully prolongs a traffic stop, the evidence seized as a result of it should be suppressed.

Although *Campbell* was vacated pending en Banc review, the vacated opinion still provides valuable insight into the state of the law regarding the issues presented. Citing *Cabelles*, *Florida v. Royer*, 460 U.S. 491 (1983), and *United States v. Place*, 462 U.S. 696 (1983), the *Campbell* Court reenforced the well-

established idea that traffic stops must be limited in scope and duration, and that officers cannot lawfully prolong a stop without reasonable suspicion. Elaborating upon *Rodriguez*, the Court opined that traffic stops become unlawful when they are prolonged to investigate other potential crimes outside the scope of the traffic violation.

Clearly then, the logic of the *Rodriguez **and** Campbell* opinions and the caselaw cited therein are unequivocal in identifying the limitations on law enforcement, to refrain from prolonging a traffic stop, to serve some other investigative desire. And the foundation of these opinions holds true, whether or not *Campbell* was vacated pending en Banc review, which has not occurred to this day. *U.S. v. Campbell*, 11th Cir. (Ga), December 2, 2020.

Nevertheless, it is clear that Justice Ginsburg, writing for the majority in *Rodriguez,* framed the question to be decided here by asking: "[h]ow could diligence be gauged other than by noting what the officer actually did and how he did it? If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" Id. (quoting *Caballes*, 543 U.S. at 407). Hence, the majority opinion made it clear that any unjustified extension of the stop means the officer did not pursue the stop expeditiously.

Certainly, these fundamental principles apply to the circumstances of the instant matter. In this case, as with

17

*Rodriguez*, there was a K-9 search of Defendant's vehicle which prolonged the traffic stop. There are three circumstances in this case which distinguish it from *Rodriguez*, but which do not alter the legal principals discussed above. First, one of the occupants of the target vehicle here was a licensed driver and could have taken control of the car while the speeding issue was handled and Defendant's identification was confirmed. Second, Defendant's vehicle was not stopped on the roadway as contemplated by the exigency exception to the warrant requirement and was in fact detained in a parking lot on private property. In this regard, the law is clear that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U. S. 347, 357 (1967). While "exigent circumstances" can provide such an exception, as stated above, there was no exigency here and as such, a warrant was required to search the vehicle.

Moreover, once defendant was detained, for "speeding" 5 miles an hour over the posted limit, and separated from the vehicle, there was no danger posed to the arresting officer from any item within it. More importantly, neither the vehicle nor anything inside of it could have been considered evidence of the "crime"

being investigated. Among the exceptions to the warrant requirement is a search incident to a lawful arrest, see *Weeks v. United States*, 232 U. S. 383, 392 (1914), which derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations. See *United States v. Robinson*, 414 U. S. 218, 230-234 (1973); *Chimel v. California*, 395 U. S. 752, 763 (1969). To that end, in reinterpreting the rule it first enunciated in *New York v. Belton*, 453 U.S. 454 (1981), the United States Supreme Court held in *Arizona v. Gant*, 556 U.S. 332 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) that "the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Id. Here, there were multiple officers on the scene, both the driver and passenger had been removed from the vehicle and secured.  In fact, Henao handcuffed the defendant and interrogated her inside another police vehicle. Consequently, even if Munoz believed that Ozon's alert to the inside of the target vehicle established probable cause to search it, a warrant would have been required.

Third, that Defendant did not have a driver's license on her person was again a traffic violation for which she was not subject to arrest. See, O.C.G.A. 40-5-29 (a)and (c). However, regarding

19

this possible traffic violation, once he was presented with a photo of Defendant's passport immediately after the stop and her identity was verified by fingerprint analysis on the scene, Munoz moved directly to the search of the target vehicle and his drug investigation. Never having addressed the purported basis for the traffic stop, speeding. Essentially, Munoz abandoned the traffic violations in this case in favor of the true basis for the stop, a search for drugs. And although he eventually returns to the license/identity issue, he does not do that until 15 minutes into the stop, after the K-9 search of the target vehicle had occurred. Therefore, as in *Rodriguez*, "[t]he critical question" becomes "whether conducting the sniff 'prolong[ed]' 'the stop'" to a point where Defendant's Fourth Amendment rights had been violated. Id. at 1616 (internal citation omitted.) The answer here is a resounding, "yes", because arranging for and conducting the "sniff" of Defendant's vehicle was Munoz's admitted purpose in conducting the stop in the first place. From the time Munoz got Defendant out of her vehicle, he put the investigation of any traffic violation on hold, because the search for drugs was always his intended purpose, "[r]egardless of the stop for speeding". (T.115, L3-9).

To faithfully apply *Rodriguez*, therefore, this Court must determine whether this stop was illegally prolonged by: (1) Munoz's irrelevant questions of Defendant regarding destination, tattoos,

where she was coming from, if the vehicle contained contraband and whether she would consent to a search; as well as the deployment of the K-9 in the hope he would be able to search Defendant's vehicle for drugs. And because the stop *was* impermissibly prolonged, it is clear Munoz's efforts violated the Supreme Court's finding that even a de minimis extension of a traffic stop for reasons unrelated to its mission, is unconstitutional. *Rodriguez*, supra.

Moreover, it is not just the *Rodriguez* opinion that emphasizes these limitations on the scope of a traffic stop. The Supreme Court has repeatedly held that an unjustified expansion is impermissible, however brief. In *Warden v. Hayden*, 387 U.S. 294, 310 (1967) it held that any warrantless search or seizure must be "strictly tied to and justified by the exigencies which" authorized dispensing with the warrant requirement. In *Florida v. Royer*, 460 U.S. 491, 500 (1983), the Court stated that a seizure "must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." In *Meuhler v. Mena*, 544 U.S. 93, 101 (2005), the Court found roadside questioning unrelated to the reason for the stop did not offend the Fourth Amendment, but only because the questions did not extend the duration of the stop. Compare *Caballes*, 543 U.S. at 408, which clearly provides that a traffic stop "prolonged beyond the time reasonably required to complete th[e] mission" was unlawful; and *Johnson*, 555 U.S. at

333, where the Court stated that irrelevant questions which "measurably extend" a traffic stop made the stop unlawful.

In sum, this Court can only "gauge" when the "tasks tied to the traffic infraction . . . reasonably should have been -- completed," based on "what the officer actually did and how he did it." *Rodriguez*. Because Munoz and Stanley "measurably extended" Defendant's traffic stop for a speeding violation, this Court should find that the delay implicated Defendant's Fourth Amendment Rights and suppress all evidence discovered during the unlawful search of his vehicle that day. *Johnson*, 555 U.S. at 333.

**The Search**

As all of the witnesses at the hearing admitted, Defendant's vehicle was stopped for the purpose of searching it in hope that drugs would be located. Nevertheless, assuming arguendo that probable cause may have existed to search the Ford Fusion based upon the intercepted calls and surveillance conducted by law enforcement that day, that authority was extinguished when Agent Grimwade witnessed the only package known to have been in said vehicle being removed from it, with no evidence that anything was ever put back in. (Ex. 5, 3/18/20 4:27:21- 4:30:33 PM). Furthermore, Defendant Hernandez clearly refused consent to search her vehicle, whereupon Munoz illegally prolonged the stop by having Stanley, who had been present on the scene from the inception of the stop, deploy his K-9 to conduct a "free air". This search

occurred 15 minutes after the Defendant was pulled over for speeding, with no ticket or warning ever having been prepared or issued for the infraction. In fact, at no time during the stop was there ever further discussion about the speeding violation whatsoever.

As a threshold matter, it is clear that one's Fourth Amendment rights to privacy in their vehicle are not automatically forfeited upon a K-9's alert to the suspected odor of drugs about the vehicle; particularly when it is not on the highway or in transit. Pretermitting the confrontation issues raised by relying on a dog's purported "alert" to the odor of drugs, here dog handler Stanley admitted in his testimony that Ozon's capacity to detect drugs is not infallible. Moreover, he agreed that Ozon does not actually detect the presence of illegal narcotics, rather he is trained only to detect the residual odor of them. (T. 145, L19-21). That is, he admitted there is no way to gauge whether the "alert" establishes probable cause that evidence of a crime is actually present, or whether the suspected contraband was present in the past rendering the information provided by the K-9 stale. Furthermore, Ozon's training records, when coupled with Stanley's experiences deploying the dog, can hardly be considered reliable. Stanley testified that Ozon has had both false positives – alerting when drugs are not present – as well as false negatives – not

alerting when drugs are present - in his training and actual past deployments. (T.147, L.13-19).

Additionally, Stanley confirmed that Ozon's training never tested whether he alerted even when there were no drugs to find – because in his training there were *always* drugs present. (T. 148, L2 – T.149, L1). Further detracting from his reliability is the fact that Ozon is rewarded with a "gift" and is "praised up" for every positive alert. This leaves it up to Ozon to decide whether or not to alert if the odor is not present, but a gift and praise await him if he does. This Pavlovian response was instilled in Ozon by his training where, according to Stanley, the praise and treats are amplified when Ozon gives a positive alert as compared to when he is deployed and does not alert. (T.158, L10-16). Because Ozon's training never included scenarios where there were no drugs to find, and because he has been incentivized to give positive alerts, whatever opinion Stanley had regarding Ozon's reliability in detecting the odor of drugs must be taken with a grain of salt. More importantly though, it cannot form the basis for probable cause to search under these circumstances.

Finally, Ozon's "free air" search of Defendant's vehicle was not a free air search at all. The idea of a free air search is that although the animal cannot enter the vehicle to search without a warrant, it can be deployed to test the air around the vehicle to determine if the odor of contraband is emanating from it. The

24

video recording of the encounter here, clearly demonstrates that when Defendant was directed to exit the vehicle, which she did, Munoz clearly kept the door from closing behind her and in fact pulled open and left it that way, knowing the K-9 was present to eventually at some point conduct a free air search. (Ex. 1). And in this regard, it is unrefuted that immediately upon telling Ozon to "find the gift", that he went directly to the door Munoz had pulled open and stuck his head inside the vehicle, whereupon Stanly testified the dog alerted by "standing and staring" at the interior of the car. (T.155, L12-14, Ex.1, Ex.2). Therefore, any purported alert was to the protected interior of Defendant's car rather than the air around it, contrary to her 4th Amendment rights to privacy and to be free from government trespass. Stanley never walked the dog around the exterior of the vehicle to see if he would have alerted to the outside of the car. (T. 155, L18-25).

When "the Government obtains information by physically intruding" on the persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1 (2013) (citing *United States v. Jones*, 565 U.S. 400 (2012)). Here, the information obtained from the "sniff" *inside* Defendant's vehicle was clearly a search within the fundamental meaning of the Fourth Amendment. As such, this search was undoubtedly an invasion of Ms. Hernandez's "right to privacy" recognized in *Katz*, 389 U.S.

25

347.   But the recognition of privacy rights in *Katz* merely added to the baseline of Fourth Amendment protections.   *Katz* did not take anything from the "property rights" protected in the Fourth Amendment which always apply "when the Government *does* engage in [a] physical intrusion of a constitutionally protected area." *Jardines*, (citing *United States v. Knotts*, 460 U.S. 276(1983)).

In *Jones*, supra., the Supreme Court held that the government's attachment, without a warrant, of a GPS tracker to a suspect's vehicle trespassed upon his property. Here, the same type of trespass has occurred. The K-9's entry into Defendant's vehicle to search allowed the Government to obtain information that would not have been known but for the illegal trespass. This holds particularly true in this case as the dog was never deployed to the outside of the vehicle so there is no evidence the odor would have otherwise been detected. "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by the physical intrusion onto Defendant's property to gather evidence, is enough to establish that a search occurred." *Jardines*, at 11. Because the dog sniff was of the inside of the target vehicle, it was a trespass on Defendant's property without a warrant and consequently all the fruits of this illegal search must be suppressed.

## *Miranda* Violations

Custody for the purposes of *Miranda* begins when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).  To determine whether a defendant is in custody under *Miranda*, courts use a totality of the circumstances test to decide whether "a reasonable man in his position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001); *Brown*, 441 F.3d at 1347.

There is no doubt here that Defendant Hernandez was restrained and not free to leave after Trooper Munoz detained her for a speeding violation. The video of the encounter clearly shows that she was told to get out of her vehicle, where to stand, and advised she could not make phone calls.  The video also shows that Munoz and dog handler Stanley positioned their vehicles to block her vehicle from exiting the parking lot where their traffic investigation was ongoing.  In addition, Munoz testified at the suppression hearing that Defendant was not free to leave and was not allowed to make phone calls. (T.99 L7-25, T.117, L10-12).

For *Miranda* protections to apply, a defendant must also show there was an interrogation.  "Interrogation" is not limited to a formal police inquiry. Rather, it also embraces any "functional

27

equivalent" thereof utilized by the investigating officer which he should know would likely elicit incriminating responses. *Rhode Island v. Innis*, 446 U.S. 291 (1980).   Under any analysis, it is apparent that Munoz's was trying to get Defendant to provide incriminating information pertaining to the government's drug investigation, by interrogating her during the traffic stop about: where she was coming from, her destination, whether she was paid to courier drugs, whether she was forced to courier drugs, how many times she has engaged in this activity, how well she was paid, and who the car she was driving belonged to. (Ex. 1). And, although she was in custody at the time of this questioning, Munoz readily admits he never advised her of her rights under *Miranda* before his interrogation began. (T. 120, L2-5). Therefore, any statements Munoz elicited from Defendant Hernandez during that questioning must be suppressed.

Similarly, Henao's continuation of the drug investigation after he was given charge of Defendant from Munoz, also violated her Fourth Amendment rights and her Fifth Amendment protections under *Miranda*, as his questioning also proceeded without advising Defendant, or getting a knowing waiver from her, of her Constitutional Rights.  And again, Henao also admitted that while she was in his control that Hernandez was not free to leave. (T.187, L 21-22). In fact, he actually handcuffed her and escorted to sit inside a police vehicle for questioning. (T.169, L22 –

T.170, L1), (T.170, L5-12).   Henao testified that during his interview, which occurred almost an hour into the stop, he did read his DEA 13A card, which he characterized as "a *Miranda* rights form". (T. 175, L21-22).   However, Henao did not provide Hernandez any other documents, read anything else, or expressly ask her whether she actually agreed to *waive* the rights he eventually advised her of. Likewise, he never inquired into her first language or educational background, to assure she had the capacity to understand the rights she was giving up.  (T.18, L15-19).  Instead, he only asked her if she *understood* her rights, never inquiring as to whether she wanted a lawyer to explain those right to her, as contemplated by *Miranda,* or to be present with her during questioning. (T. 191, L12-20)(T.192, L4-5).

Because there was no voluntary waiver of her right to remain silent or to have a lawyer present during questioning, any statements elicited from Hernandez during Henao's interrogation must be suppressed. Moreover, even if the Court finds there was a knowing and intelligent waiver based upon the circumstances of her interaction with Henao, the taint from the unlawful interrogation by Munoz during the first hour of the stop and the hopes of benefit he offered her to speak to him, cannot be overcome by such subsequent waiver. Surely if there was benefit, as explained to her by Munoz, in talking to him about her involvement in drug dealing, those benefits would have to continue no matter which

29

officer was questioning her about her role in the drug investigation.

<u>Defendant Hernandez's Statements Were Not Voluntarily Made</u>

To be voluntary, a statement must be freely and willingly given, with complete understanding, *without coercion, duress, threats,* use of violence, or fear of injury, *and without any suggestions or promises of leniency or reward. Jackson v. Denno*, 378 U.S. 368, 377 (1964).  A statement induced by the slightest hope of benefit, or the remotest fear of injury, is not voluntary.  To be voluntary, a statement must be the product of a free will and not under compulsion or any necessity imposed by others.

The testimony of both Trooper Munoz and Agent Henao makes clear that they consistently and repeatedly overcame Defendant Hernandez right to remain silent, and desire not to speak, with promises, threats, and by explicitly giving her hope of benefit from speaking to them.  And, anytime Hernandez showed some resistance or hesitancy to talk, it was met with both implied and overt threats, and more hope of benefit.

In particular, Munoz admitted that during his un-Mirandized interrogation, when Hernandez did not provide answers to his questions he told her, "this is the time to be honest… this is important because if there's drugs in your car you can go away for

a very long time…like your kids will have kids before you get out."
(Ex. 1, T.119, L.2-11).  When threats alone did not elicit the
information he wanted, Munoz resorted to telling Hernandez she
could benefit by providing the information requested of her and
answering his questions.  More specifically, on several occasions
through the traffic stop video (Ex.1), Munoz told Hernandez she
could help herself by providing the information he was asking
about. (T.123, L16 – T.124, L1).

As stated herein above, Henao did marginally better than
Munoz.  Unlike Munoz, Henao at least read the *Miranda* rights to
Hernandez, though he admitted she did not actually waive them. (T.
189, L15-19)(T.193, L25 – T.194, L4). In addition to the coercive
and threatening tactics used by Munoz, Henao used clearly overt
promises of leniency and reward to induce Defendant to make
incriminating statements and to overcome her desire to remain
silent. For instance, Henao testified, and he included in his
report, that whatever information she was willing to provide, "was
to help her since it was at a federal level and she was detained
with more than ten kilograms of crystal methamphetamine." (T. 197,
L10-17).  Henao also agreed during the hearing that, when Hernandez
became reluctant to talk, he encouraged her to continue answering
his questions by telling her that her answers were going to help
her, not the government, but her. (T.197, L.18-22

In this case Defendant Hernandez did not knowingly and intelligently waive her rights to remain silent or to counsel. Instead, she acquiesced and answered law enforcement officers' questions based upon the coercive tactics they employed to obtain her answers. Those tactics specifically include overtly advising her that she would be: rewarded and shown leniency if she agreed to speak with them; or more severely punished if she did not. Consequently, the answers given to said questions were obtained contrary to her Constitutional Rights guaranteed under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. See *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed.2d 682 (1936), *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and their progeny. See, e.g. *Edwards v. Arizona*, 451 U.S. 477 (1981); *Davis v. United States*, 512 U.S. 452 (1994); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1969).

## CONCLUSION

Wherefore, Defendant prays that this Court Grant her Motion to Suppress the fruits of the unlawful stop and warrantless search of her vehicle, as it occurred contrary to her Rights under the Fourth Amendment to the United States Constitution. Additionally, Defendant Hernandez moves the Court to suppress any and all statements she made to law enforcement after her detention for a

traffic violation, as they were the fruits of the unlawful stop; were made in the absence of her right to counsel; without a knowing and intelligent waiver of her right to remain silent; and as a result of coercion, threats, and the hope of benefit, contrary to the Fourth, Fifth, and Sixth Amendments to the United States Constitution.

Respectfully Submitted, this 19th day of November, 2021.


/s/ L. David Wolfe
L. David Wolfe, P.C.
Georgia Bar No. 773325
david@ldavidwolfe.com
Attorney for Defendant
101 Marietta St., N.W.
Suite 3325
Atlanta, Georgia 30303
404-352-5000

/s/ Brian Tevis
Tevis Law Firm, LLC
Georgia Bar No. 615008
brian@tevislawfirm.com
Attorney for Defendant
101 Marietta St., N.W.
Suite 3325
Atlanta, Georgia 30303
404-921-3800

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|

**UNITED STATES OF AMERICA,**

|       **CRIMINAL INDICTMENT NO.:**
        **1:20-CR-196-LMM-JSA-7**

**v.**                                     |

**MARIELA HERNANDEZ,**                     |

      **DEFENDANT.**                       |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing *Brief in Support of Defendant's Motion to Suppress Illegally Obtained Evidence* by electronically filing with the Clerk of the Court by using CM/ECF, which will automatically send email notification of such filing to the following:

**John Thomas DeGenova**
Assistant United States Attorney
600 US. Courthouse
75 Ted Turner Drive SW
Atlanta, Georgia 30303
404-581-6000
John.DeGenova@usdoj.gov

Respectfully Submitted, this 19th day of November, 2021.


/s/ L. David Wolfe                /s/ Brian Tevis
L. David Wolfe, P.C.              Tevis Law Firm, LLC
Georgia Bar No. 773325           Georgia Bar No. 615008
david@ldavidwolfe.com            brian@tevislawfirm.com
Attorney for Defendant           Attorney for Defendant
101 Marietta St., N.W.           101 Marietta St., N.W.
Suite 3325                       Suite 3325
Atlanta, Georgia 30303           Atlanta, Georgia 30303
404-352-5000                     404-921-3800