**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | | |
| | | CRIMINAL INDICTMENT NO.: 1:20-CR-196-LMM-JSA-7 |
| v. | | |
| MARIELA HERNANDEZ, | | |
|    DEFENDANT. | | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS**

COMES NOW Defendant, by and through undersigned counsel and files her <u>Reply Brief in Support of Her Motion to Suppress Illegally Obtained Evidence</u>[1], and shows this Court the following:

## I.    PREFACE

Defendant's motions, and brief in support thereof, outlined several reasons to suppress the illegally obtained evidence in this case.  Those reasons fall under two categories: 1) Defendant's vehicle was illegally stopped *and* searched contrary to her Fourth Amendment Rights; and 2) Defendant's statements made after her arrest/detention for the traffic violation/suspected drug crimes, were obtained prior to having been advised of her Fifth Amendment

---

[1] Defendant moves the Court to allow additional pages for her reply, commensurate with the additional pages in the Government's response to her initial brief and citation of authority.

rights under *Miranda*[2]. Moreover, any statements made before or after she was advised of her *Miranda* rights, were induced by a hope of benefit.

## II.   THERE WAS NO PROBABLE CAUSE FOR THE WARRANTLESS SEARCH

Regarding the search, the Government contends in its brief (Doc. 287), that the search of Defendant's vehicle was valid for three reasons: (1) the agents had a reasonable suspicion of illegal drug activity sufficient to stop Defendant's vehicle prior to any alleged traffic violation, based upon telephone calls intercepted pursuant to a valid Wiretap; (2) the traffic stop was not unlawfully prolonged in violation of *Rodriguez*, because the detaining agents were also investigating their suspicions of illegal drug activity at the time of the stop; and, (3) the warrantless search of Defendant's vehicle was lawful under the automobile exception to the warrant requirement.

All of these contentions are predicated upon information the Government contends was within the "collective knowledge of law enforcement" at the time of the stop.

---

[2] Though the Government has indicated it does not plan to use any "pre-*Miranda*" statements in its case in chief, nonetheless it has not ruled out their use for other purposes. (Governments Brief, Doc. 287, P.2, footnote 2).

### A. ANY SUSPECTED DRUGS WERE REMOVED FROM DEFENDANT'S VEHICLE PRIOR TO THE TRAFFIC STOP

Critical to the Government's "collective knowledge"[3] argument is the assertion that contraband was placed into Defendant's vehicle during a stop at a residence in Newton Estates, shortly before an orchestrated traffic stop of Defendant's vehicle occurred. The government makes this assertion based upon the following testimony at the suppression hearing, wherein Agent Boone states:

> "Then, agents **observed that** the Ford Fusion backed into the Newton Estates residence's driveway, the trunk opened, a man retrieved a large box from the trunk and brought the box into the house[.] [T]he man returned [to the car] **and placed a large container into the trunk**, and the Fusion left without anyone getting out of the vehicle (T. at 64-65)." (Emphasis added) (Doc. 287, P. 7)

These purported facts are so critical to the validity of the stop and search of Defendant's vehicle, that the government cites to this testimony repeatedly throughout their brief. Said citations are offered in an attempt to establish that suspected contraband was removed from the trunk of said vehicle at the Newton

---

[3] Although the Government devotes 6 pages of its brief to the background of this investigation, prior to the traffic stop that is the subject of this motion, that investigation consisted *entirely* of intercepted, coded phone calls, which Agent Boone "believed" were about drugs. However, the undisputed testimony from Boone was that no drugs were ever mentioned on any of the intercepted calls (Tr. 33, L. 3-7), and no drugs had ever been intercepted as part of the investigation prior to the search at issue here. (T. 73, L. 2-5). The result is a record, and Government brief, replete with what Agent Boone "believed" was occurring, yet lacking objective evidence of criminal activity.

Estates residence, and thereafter a "large container" of contraband was "***placed*** … [back] ***into the trunk***". (Doc 287. at 7,8, 13, 14, 15, 18, and 22).

In so doing, the government admits that any contraband agents believed was in the vehicle when it arrived at the residence in Newton Estates, was removed when the "box" was taken from the trunk and brought inside the residence there. And, along with the box, went any articulable suspicion they may have had to search Defendant's vehicle for contraband ***prior to*** the stop in Newton Estates, unless there was evidence to establish that suspected contraband was placed back into the vehicle there.[4] No such evidence was introduced at the hearing.

In this regard, it is true that Boone testified on direct examination that agents observed the individual who removed the box from the vehicle, return to it and "place a large container into the trunk" (T. 64-65). However, a reading of her entire testimony reveals that Boone had no personal knowledge of this alleged "fact" at all. Instead, she was relying on what she mistakenly *believed was in* the WhatsApp chat going on among the

---

[4] The Government's contention that even without this knowledge law enforcement had probable cause to search Defendant's vehicle for "Cornejo's phone, which was used to coordinate drug transactions", (Doc 287, P.16, fn 7) is a red herring. Cornejo had her phone on her person when she was extricated from the vehicle and detained away from it throughout the stop. In fact, she was advised she could not use her phone while she was being detained.

surveyling agents who were following Defendant's vehicle that day. When asked on cross-examination about the testimony cited in the Government's brief, Boone admitted:

> Q. So the surveillance people were in front of the driveway; correct?
>
> A. I can't speak to where they were actually sitting
>
> Q. Okay. Well, are you sure somebody saw something coming out of the trunk ***and going into the trunk of the Ford Fusion***?
>
> A. **Based on Exhibit Number 5** and inside – on the chat, I *believe* it is -- it is actually communicated in the group [chat] what occurred. (Emphasis added)

(T. 83, L. 9-13) (emphasis added).

Nonetheless, the WhatsApp chat upon which her belief relied, (Exhibit 5 to the suppression hearing) contained no such information. To the contrary, according to the text of the chat (See, Exhibit 5) surveilling agent Henao was so unsure anything went back into the vehicle after the box was removed, that he inquired specifically of the entire surveillance team whether anyone saw anything placed back into the vehicle:

> "[3/18/20, 4:27:21 PM] Daman Grimwade: Walked in with Hugh [sic] box she got out of the trunk." . . .
>
> "3/18/20, 4:30:33 PM] Miguel Henao: Stay with that car until it gets pull over. **Did anything go[] into it?**", to which he got no response. (Emphasis added)

(Ex. 5).

Although Boone made vague references in her testimony to agents communicating that day via radio and phone in addition to

the WhatsApp chat, there is no evidence in the record that anyone ever stated, called or radioed any other member of the investigation team to indicate they saw anything placed back into the trunk of the Ford Fusion. Hence, contrary to Boone's testimony, because Henao's question went unanswered, the record is devoid of any evidence that a container of suspected contraband was placed ***into the trunk*** of Defendant's vehicle before it left Newton Estates.

Therefore, under the totality of the circumstances analysis, the only evidence of criminal activity in the "collective knowledge" of law enforcement at the time Defendant was stopped for speeding, was: (1) that the narcotics they believed from the wiretap were in the vehicle, had been *removed* at the residence in Newton Estates; (2) with nothing in the record to establish Boone's mistaken "***belief***" that contraband had been put back into the vehicle.

As a result, the true collective knowledge of the investigating agents prior to the "traffic stop" of Defendant's vehicle, rested entirely upon the content of the intercepted phone conversations and the observations of those surveilling said vehicle prior to the stop. That being the case, whatever suspicions the agents derived from the intercepted phone calls, even if true, dissipated when they witnessed the suspected contraband believed to be in the vehicle when it arrived at the

residence in Newton Estates, being removed from the vehicle. More importantly, there is no evidence in the record to support Boone's mistaken belief that contraband was in Defendant's vehicle when it departed said residence.

## B. THE K-9 ALERT DID NOT PROVIDE PROBABLE CAUSE UNDER THE FACTS OF THIS CASE

As stated above, law enforcement suspected drugs might be in Defendant's vehicle prior to its arrival at the residence in Newton Estates, based on the intercepted phone calls. It is also clear, however, despite the DEA's suspicions as to the nature of those calls, that prior to the traffic stop of Defendant's vehicle there had been no undercover buys, busts or arrests during their investigation of said calls. Nor had they confirmed in any way their suspicion of criminal activity stemming from the wiretap investigation. As a result, because the only suspected contraband observed going into Defendant's vehicle had been removed prior to the traffic stop at the Newton Estates residence, there was no longer an independent basis to search it for drugs in the event of a traffic stop, unless something developed during the investigation of the alleged the traffic violation.

Therefore, at the time of the stop, State Trooper Munoz had no valid basis to believe drugs would be in Defendant's vehicle when it was stopped. Nor did he have an independent legal basis to justify a search of the vehicle. Critically, regarding probable

cause, it must be noted that neither Munoz nor Officer Stanley, the dog handler in this case, ever testified that either of them detected an odor of illegal drugs emanating from the vehicle, even though they both approached it and spoke to the occupants thereof. The simple truth is, as he testified, Munoz was stopping and searching Defendant's vehicle that day "no matter what" and that's exactly what happened, contrary to Defendant's Fourth Amendment rights.

In an attempt to validate the search of the target vehicle, in addition to Trooper Munoz, a K-9 Unit was also enlisted and on standby to help establish probable cause with a free air search after the traffic stop of Defendant's vehicle. And, although a K-9 search in a typical traffic stop often results in an alert resulting in probable cause to search, the totality of the circumstances here demonstrates that "the dog" and the "free air search" were equally defective and the contraband discovered in the target vehicle must be suppressed.

As stated in Defendant's initial brief, Ozon, the K-9 who by design responded to the traffic stop with his handler, "alerted" on Defendant's vehicle. However, based on the information learned about the dog at the suppression hearing, the alleged "alert" can hardly be deemed reliable due to the dubious methods used to train him.  Not only did Ozon have false positives and false negatives in his history, but **every time** he was deployed in training there

8

were narcotics present, and he was rewarded every time he alerted. (T. 147, L. 13-19);(T. 148, L. 17-25).  In essence, he was trained to alert every time he is deployed and, in return, he will receive a "gift". In fact, Stanley testified he could not recall **any instances** that Ozon **didn't alert** in an actual K-9 deployment during a traffic stop. (T. 157, L14-21).   Furthermore, that Ozon alerts by sitting, standing, staring, or laying down, leaves *nothing* the dog could do after having been deployed that wouldn't be construed as an "alert".  In this instance the dog "stood and stared". (T. 156, L.4-13).

This dubious set of facts hardly constitutes reliable information of a positive alert for drugs emanating from Defendant's vehicle.  Most importantly though, Officer Stanley testified that Ozon cannot detect whether drugs are actually present, or identify particular drugs.  Instead, he is trained to detect the **odor** of marijuana and certain narcotics.  (T. 145, L. 19-21).  This is a critical distinction, because it means that Ozone's alleged alert to the residual odor of illegal drugs, coupled with law enforcement's collective knowledge that there **were** drugs in the car **prior** to the stop in the Newton Estates subdivision, puts into question whether the alert constitutes probable cause to search it. Clearly, the agents witnessed the container believed to contain illegal narcotics being removed from the vehicle moments before the stop.  As such, even if Ozon alerted

to the residual *odor* of those drugs, there was no reason whatsoever to believe the evidence sought would ***still be found in the vehicle***.

In addition, under the totality of the circumstances in this case, while the K-9's alert here did not provide probable cause under these unique circumstances, even if they did, the evidence must be suppressed because the dog had admittedly trespassed into the target vehicle to obtain the information which caused him to alert in the first place.

### C. THE TRESPASS INTO DEFENDANT'S VEHICLE

It is uncontested that upon K-9 Ozon's deployment here he went straight to the open driver's side door of the vehicle[5] "and put his head inside". (Exhibit 1 – Munoz Video, Exhibit 2 – Stanley Video). (T.154, L1-15).  Stanley testified it was not until Ozon made ***entry into*** the vehicle that he gave a positive alert for the odor of contraband. (T. 156, L4-10).

As the Supreme Court of the United States made clear in *Illinois* v. *Caballes,* a drug dog's sniff of the ***exterior*** of a car does not require a warrant because it is not a "search" for Fourth Amendment purposes. 543 U.S 405 (2005).  This is so because a person cannot have a legitimate expectation of privacy in contraband, and an exterior sniff that reveals the likely

---

[5] Which Munoz pulled all the way open when Defendant exited the vehicle. (Exhibit 1 – Munoz Video, Exhibit 2 – Stanley Video). (T.154, L1-15).

possession of contraband within a target vehicle "compromises no legitimate privacy interest." Accordingly, the use of a well-trained narcotics-detection K-9, which does not expose noncontraband items that otherwise would remain hidden from public view – during a lawful traffic stop, generally does not implicate legitimate *privacy* interests. *Id.* at 408-409. This is precisely why police departments employ K-9 units to conduct "free air" sniffs of the exterior of suspect vehicles, to obtain information without violating the Fourth Amendment, that can establish probable cause to then enter and search the vehicle.

However, in 2012, in deciding *United States v. Jones,* where the Government had attached a GPS device to the Defendant's vehicle, the Supreme Court held that the Fourth Amendment *does* apply when law enforcement physically occupies a vehicle "for the purpose of obtaining information", because the Fourth Amendment protects *property* interests in addition to *privacy* interests. 565 U.S. 400 (2012). It was in Jones that the Court reiterated that the Fourth Amendment does not rise and fall with the *Katz* "reasonable expectation of privacy" calculus; rather, for most of our history the Fourth Amendment embodied a particular concern for government *trespass* upon our persons, houses, papers, and, as here, our effects. *Jones.* at 406-407. Accordingly, the Court held that while a trespass alone is not a "search," a trespass for the purpose of obtaining information *is* a search under the Fourth

Amendment. *Id*. at 408.  And because the government had physically intruded upon the car by attaching an information-collecting device to it, the Court held an illegal search had occurred.  *Id.* at 404-405.  The *Jones* analysis is directly applicable to the case here. Hernandez disputes that K-9 Ozon's training and alleged alert constituted reliable information to establish probable cause.  But even if it could, Ozon only obtained the information causing an alert ***after trespassing*** inside the vehicle.  Instead of doing a free air sniff of the vehicle's exterior perimeter that comports with the Fourth Amendment privacy and property protections, Ozon conducted a search of the ***inside*** of the vehicle in violation of the Fourth Amendment.  *Jones* is clear that a search occurs when the government trespasses in order to obtain information.  There is no exception to the Fourth Amendment that excuses unconstitutional acts of law enforcement simply because they are accomplished by means of a dog trained to do so.

The Supreme Court applied the trespass analysis again in *Florida v. Jardines*, a 2013 case involving a trained narcotics dog, to find that the use of a K-9 to sniff the area surrounding the home for drugs was a "search" within the meaning of the Fourth Amendment.  In *Jardines,* the government argued, under *Caballes,* that the drug dog's sniff of the exterior threshold of the residence by definition did not implicate any legitimate privacy interest. But the Supreme Court rejected this argument in light of

12

the trespass that had to occur to obtain the information.  Citing *Jones*, the Court articulated that "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Id.* at 11.  The Government's contention here, that the *Jardines* rationale is inapplicable because no curtilage is implicated, is to miss the point entirely.  (Doc. 287, P.24) The question is whether a trespass has occurred in violation of the Fourth Amendment's protections. It is true that the Fourth Amendment protects the home, and its curtilage, but it affords the same protection to "effects", like Defendant's vehicle here.  And, like in *Jardines,* because "the officers learned what they learned only by physically intruding into [Defendant's] property to gather evidence", nothing more is needed to establish that a search occurred and suppression is warranted. *Id.*

The Government next attempts to excuse the dog's illegal trespass by blaming the dog's "instinctive" behavior and claiming that the dog is not a state actor. (Doc.287, P.24).  This reasoning is flawed and only distracts from the issue before the Court. First, upon ordering Hernandez and Cornejo to exit the vehicle, Munoz prevents the driver's side door from being closed and actually opens it further.  This intervening act by Munoz, to keep the door open, thereby giving Ozon access to the interior of the vehicle, is precisely what leads the K-9 to stick his head inside the car before alerting.  Thus, this case is factually

13

distinguishable from other situations where there was no officer interference to create the opportunity for the dog to intrude on Defendant's protected property.

More importantly, **none** of the three cases cited by the Government - where other circuits have taken this "instinctive" behavior approach to the dog's trespass - were decided after the United States Supreme Court decided *Jardines* and *Jones* and re-affirmed the Fourth Amendment's property rights baseline. Further, the Government's urgence to excuse the dog's entry into the vehicle because it is somehow the result of a natural "instinct" is preposterous. First, there is nothing natural about a dog seeking out narcotics; the dog's behavior is the result of training and repetitive reinforcement specifically so that it can be deployed to assist government agents. Second, the government seems to argue when the dog acts in accordance with the Fourth Amendment the dog is a highly trained tool of law enforcement, but when it violates the law it is merely acting on instinct. The Government cannot have it both ways. Law enforcement is wholly responsible for the training and deployment of its drug dogs; it is likewise wholly responsible when, as a result of their training and deployment, dogs enter vehicles during what should be **exterior** sniffs. The Supreme Court of the State of Idaho put it aptly in interpreting these Fourth Amendment principles, "[i]f dogs can be trained to seek out substances they have no natural inclination to

14

seek, and then to respond to their presence with specific and predictable behaviors, then surely they can be trained not to [enter vehicles] in the process.  If they cannot, it is not the Fourth Amendment that must yield." *State v. Randall* 496 P.3d 844 (2021)[6]

Consequently when, as here, the dog has not alerted to an odor of narcotics *prior* to the trespass, the "instinctive entry" rule is plainly at odds with *Jones* and *Jardines*.  While the K-9 "free air" sniff may be compatible with the *Katz* expectation of privacy analysis, there is no Fourth Amendment exception for the dog's trespass *inside* of the vehicle to obtain evidence the government needs to establish probable cause.  As reasoned in *Jones* and *Jardines*, the trespass test keeps easy cases easy by requiring a warrant or valid warrant exception where a trespass by the government is for the purpose of obtaining information.

**D. THE INTERROGATION**

After the target vehicle was stopped, Munoz encountered its two occupants. Because he was admittedly stopping the vehicle "no

---

[6] Though Federal Circuits that have considered the K-9 trespass cases and the notion of "instinctive" behavior, like those cited by the Government, all pre-date the United States Supreme Court decisions in *Jones* and *Jardines*, the Supreme Court of Idaho recently tackled the issue in two opinions on October 5, 2021. For an excellent primer on the application of the trespass test to the factual scenario of the case sub-judice where a drug dog intrudes ***inside*** of the vehicle prior to an alert, See *State v. Randall*, 496 P. 3d 844 (2021) and *State v. Howard* 496 P.3d 865 (2021).

matter what", based upon what he had been told by the DEA about suspected drug activity, Munoz immediately abandoned the investigation of the purported traffic violation and immediately began asking Defendant drug interdiction questions. He interrogated her about her tattoos, whether she had contraband in the vehicle and asked both the driver and passenger for consent to search it for drugs. He asked if she was a drug courier, how much she was paid, was she forced to courier drugs, and whether she had done this before. (Ex 1 – Munoz Video) (T.102, L11-12; T. 114, L12-24).

Furthermore, Munoz and Stanley had her vehicle blocked so it could not leave the parking lot where it had stopped, ordered her out of the car, told her where to stand, that she was not allowed to call anyone and that she was not free to leave. (Ex. 1)(T.117, L10-18).  Contrary to the Government's contention as to her custodial status[7], Defendant was *clearly* in custody for *Miranda* purposes.[8] Yet, although he questioned her repeatedly over the initial 50-minute period after the traffic stop, Munoz never

---

[7] "…the Government's position is that Hernandez was not in custody when she made statements to Trooper Munoz…" (Doc. 287, P.2, fn 2).

[8] The test is whether "a reasonable man in his position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)

advised her of her *Miranda* rights.  As such, any information Munoz obtained through this unlawful interrogation must be suppressed.

As to Agent Henao's interrogation of Defendant, the Government's response was that Defendant ***waived*** her *Miranda* rights,[9] and her statements were voluntary because: no physical force was used; the questioning was not exhaustively long; agents did not raise their voices; the interrogation took place inside a government vehicle in a public a parking lot; and, that guns were not drawn.  Therefore, the government summarily claims, "the record is empty" when it comes to coercion. (Doc. 287, P. 26-27). That the Government's brief does not even attempt to address the "hope of benefit" is telling.

First, the Government failed to meet its burden of proving Defendant waived *Miranda*, and any such waiver is absent from the record.  To conclude that Henao's question "Are you willing to answer some questions?", coupled with Defendant's response that

---

[9] The Government's record citations fail to establish this assertion because, in fact, there is no evidence in the record that Hernandez affirmatively waived these rights.  See, Exhibit 5, which Henao read from, which says "Before we ask you any questions, you must understand…", and then asks if the person *understands* and is willing to answer questions.  It does not include ***any*** language about ***waiving*** the right to remain silent, the right to have a lawyer present, or to have a lawyer appointed.  Furthermore, the Government's citation clearly demonstrates that in response to whether she would answer any questions, Hernandez unequivocally advises that she would not, because "she didn't know anything".  Henao never asked if she waived the rights he read to her, nor did Hernandez ever say she did.

she had nothing to tell because she did not know much, could possibly mean "I waive my right to remain silent, my right to have a lawyer appointed, and … to have a lawyer present", is a beyond the pale.

Furthermore, even if such a conclusion *could* be reached, the subsequent statements elicited were clearly the result of Henao creating a "hope of benefit", thereby rendering them involuntary.[10] Defendant's initial brief already lays bare the problems with this interrogation based upon the relevant law. However, the clearest evidence in the record of Henao's inappropriate promises in coercing Defendant to speak to him contrary to her rights to remain silent, are in the audio recording of the interrogation, Exhibit 10.

The Government's Brief cites 11:55-13:05 of Exhibit 10, which contains Henao's reading of Miranda and Defendant's statement that she does not have much to say because she does not know anything. (Doct. 287, P.26). Notably, the Government's citation concludes just before Henao's immediate response to Defendant's refusal to talk with him, in which he offers her a hope of benefit in order to overcome Defendant's unwillingness to talk:

---

[10] The failure to comply with *Miranda* creates a presumption that a confession was not voluntary. *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991). See <u>Also</u> *Jarrell v. Balkcom,* 735 F.2d 1242, 1252 (11th Cir.1984) ("[E]ven if a court finds compliance with *Miranda,* the court must still rule on the confession's voluntariness.").

Henao:      Whatever little information that you're willing
            to provide is **going to go a long way once we talk
            to the prosecutor** that is working this case,
            okay?

            Right now you hold a lot of information that is
            going to be **beneficial** to you, that is going to
            be beneficial to her[Cornejo], **but mostly to you.**

(Ex. 10, 13:05-13:22). (emphasis added)

Henao's explicit affirmations that she would benefit from
answering his questions, and that she could help herself out by
doing so, continued throughout the interrogation. Particularly
anytime Defendant became reluctant to respond to what he was
asking:

Henao:      Listen, I'm going to throw you a rope out there
            so **you can help yourself out.** (15:11-15:18)

Henao:      You already told me what it was, be more
            specific. That's going to **help you out** in the
            long run. (15:23-15:33)

Henao:      Be honest with me, **help yourself out**(15:45-15:50)

Henao:      Listen, this is *not* to help *me*, this is to **help
            you.** This is gonna go to the prosecutor, who is
            going to listen to this and read my reports and
            it's gonna be based on this. Ok, and based on
            that their gonna see if they're gonna be willing
            to work with you **to help you out.** Ok? Just think
            about the trouble that you're in. (17:17-17:38)
(Ex. 10) (emphasis added)

In addition to all of the allusions to helping herself that
Munoz made during his un-*Mirandized* questioning in the first 50
minutes of the encounter, the ***very first*** thing Henao did after he
read Miranda to her was tell Defendant she would benefit by talking

19

to him. There is simply no question that advising Defendant that anything she said could be used against her, and then telling her whatever she said was going to be beneficial to her are incompatible. After the initial inducement, Henao repeats that she is going to benefit by talking to him no less than seven times over a mere four minutes.  Moreover, Henao admitted in his own report, and at the hearing, that he did this to overcome Hernandez's hesitancy to talk to him.  (T. 197, L.18-22).

Clearly, it is a fundamental axiom of Fifth Amendment law that a statement is not voluntary if it is obtained by any direct or implied promises, however slight[11]. Because the incriminating statements here were made as a result of Henao telling Defendant how she would benefit by answering his questions, they were not freely and voluntarily made. As such, there was no valid waiver of Defendant's rights and any statements made in this case must be suppressed.

**CONCLUSION**

For these reasons, and those stated in Defendant's Motion to Suppress and her supporting Brief, Defendant moves this honorable court to suppress the evidence obtained in violation of her rights under the Fourth Amendment, the Statements

---

[11] *United States v. Mercer*, 541 F.3d 1070, 1075 (11th Cir.2008); *Malloy v. Hogan*, 378 U.S 1, 84 (1964); *Bram v. United States*, 168 U.S. 532 (1897)

obtained in violation of Defendant's Fifth and Sixth Amendment rights, as well as any fruits derived therefrom; or to allow oral argument on these issues to address any questions the Court might have as to the arguments here.

Respectfully Submitted, this 27th day of December, 2021.

/s/ L. David Wolfe              /s/ Brian Tevis
L. David Wolfe, P.C.           Tevis Law Firm, LLC
Georgia Bar No. 773325         Georgia Bar No. 615008
david@ldavidwolfe.com          brian@tevislawfirm.com
Attorney for Defendant         Attorney for Defendant
101 Marietta St., N.W.         101 Marietta St., N.W.
Suite 3325                     Suite 3325
Atlanta, Georgia 30303         Atlanta, Georgia 30303
404-352-5000                   404-921-3800

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| |
**UNITED STATES OF AMERICA,**

                          |    **CRIMINAL INDICTMENT NO.:**
                               **1:20-CR-196-LMM-JSA-7**

**v.**                             |

**MARIELA HERNANDEZ,**        |

    **DEFENDANT.**            |

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have this day served a copy of the within and foregoing REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS by electronically filing with the Clerk of the Court by using CM/ECF, which will automatically send email notification of such filing to the following:

**John Thomas DeGenova**
Assistant United States Attorney
600 US. Courthouse
75 Ted Turner Drive SW
Atlanta, Georgia 30303
404-581-6000
John.DeGenova@usdoj.gov

Respectfully Submitted, this 27th day of December, 2021.

/s/ L. David Wolfe            /s/ Brian Tevis
L. David Wolfe, P.C.        Tevis Law Firm, LLC
Georgia Bar No. 773325    Georgia Bar No. 615008
david@ldavidwolfe.com     brian@tevislawfirm.com
Attorney for Defendant    Attorney for Defendant
101 Marietta St., N.W.    101 Marietta St., N.W.
Suite 3325                   Suite 3325
Atlanta, Georgia 30303    Atlanta, Georgia 30303
404-352-5000               404-921-3800