IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA,       :

v.                                              :        CRIMINAL CASE NO.:

MARIELA HERNANDEZ,            :        1:20-CR-196-07-LMM-JSA

Defendant.          :

## REPORT AND RECOMMENDATION

On March 18, 2020, Georgia State Patrol Troopers and other officers,
working with the U.S. Drug Enforcement Administration ("DEA"), stopped and
searched a car driven by the Defendant and found methamphetamine. The officers
also obtained statements from Defendant. Several overlapping motions are before
the Court, by which Defendant moves to suppress the fruits of the warrantless
vehicle search, arguing that the officers lacked reasonable suspicion to stop the
vehicle and lacked probable cause to justify the search, and also moves to suppress
her statements to law enforcement. *See* Motions [127][128][242][282].

After an evidentiary hearing and consideration of post-hearing briefs, the
Court **RECOMMENDS** that Defendant's motions to suppress be **DENIED** to the
extent they seek suppression of the fruits of the vehicle search and **DENIED IN**

1

**PART AND GRANTED IN PART** to the extent they seek suppression of

Defendant's statements to law enforcement.[1]

## I.    FACTS

The operation that ended in the Defendant's arrest was part of a long-term

DEA drug trafficking and money laundering investigation focused on Co-

Defendants Ismael Guerrero and Cornejo and others. *See* Transcript of Evidentiary

Hearing [278] ("Tr.") at 20-21. Guerrero, while incarcerated on other charges, used

contraband cellular phones to direct Cornejo and others who were outside of prison

as to methamphetamine trafficking and related efforts. *Id*. at 22-23. The agents

intercepted calls summarized in the hearing involving Guerrero's and Cornejo's

phones over several months, which calls were believed to relate to

methamphetamine trafficking. As one example, on February 28, 2020, Guerrero

---

[1] The docket is confusing because the numerous overlapping and, in one case, mis-docketed filings. Motions [127][128] are, respectively, Defendant's initially-filed Motions to Suppress Search and Seizure of Vehicle, and Motion for Jackson-Denno Hearing and To Suppress Statements. Motion [242] is a "supplemental" motion that purports to amend and further explain, in a single consolidated motion, Defendant's arguments for suppression as to both the vehicle search and the statements. Finally, the document marked as Motion [282] is not really a motion at all but rather a post-hearing legal brief in support of the earlier-filed motions. As a technical matter, the Court **RECOMMENDS** that the Motion to Suppress Search and Seizure [127] be **DENIED**, and that the Motion to Suppress Statements [128] be **GRANTED IN PART, DENIED IN PART**. The Supplemental Motion to Suppress [242] should also be **GRANTED IN PART, DENIED IN PART**, to the same extent. And the Court **DIRECTS** the Clerk to re-docket [282] as a post-hearing brief in support of previously-filed motions [127][128][242] and not a separate motion.

and Cornejo discussed Cornejo's need to "tear" open "bags" and "flush them out

well . . . flush it in the bowl," in an apparent effort to avoid being caught with

drugs by police at her house. *Id*. at 29-30, 33-35. Guerrero assured Cornejo that

police needed "24 hours" to get a "search warrant and an arrest order," and

Cornejo replied that the police lacked any proof in that regard against her. *Id*. at 34.

On March 17-18, 2020, the agents intercepted a series of calls among

Guerrero, Cornejo, and two individuals identified at the time as UM637 and

UM122, apparently discussing an anticipated drug transaction on March 18, 2020.

*Id*. at 38-49. DEA Special Agent Andrea Boone interpreted the calls as detailing a

plan for Cornejo and another unknown courier to pick up a load of raw,

unprocessed methamphetamine from UM122 and exchange it for processed

methamphetamine from UM637. *Id*.

As a result, DEA and other officers organized a surveillance operation that

included observations of Cornejo's home, an auto shop believed to be associated

with UM122, and a residence believed to associated with UM637. *Id*. at 25, 42-44.

The operation included troopers from the Georgia State Patrol, including Trooper

Anthony Munoz. The DEA and other officers coordinated with each other via

verbal communications as well as group texts, and the DEA provided background

about the investigation including that they expected to be surveilling an anticipated

methamphetamine transaction that day. *Id*. 44, 91-92, 163-164. In addition to

visual surveillance, the agents were also continuing to intercept calls involving the subjects and were monitoring geolocational data for cellphones believed to be used by Cornejo, UM122 and UM637. *Id*. at 36, 38, 40-41, 44, 46-47. Among other calls, UM122 told Guerrero on the morning of March 18 that "I'm heading over there now… Let me know when you got it ready, so we can chop them up." *Id*. at 46-47. That afternoon, Guerrero asked UM637 if he could finish up a "quinceanera" (seemingly referring to a quantity of 15) but UM637 responded that he only had "14" ready and was checking on the temperature of the remainder. *Id*. at 52-53. Shortly thereafter, Guerrero told UM122 (who agents had identified as Michael Childers) that he could give UM122 "14" right now, presumably referring to a plan to provide the 14 kilograms or gallons or some other quantity of cooked methamphetamine from UM637. *See Id.* at 55-57.

During this time timeframe, agents intercepted calls between Cornejo and Guerrero. In these calls, Cornejo reported that she and another woman would be transporting something previously cooked. *Id*. at 54-55.  Guerrero also asked Cornejo if they were going to "pick up from Mike," seemingly referring to Michael Childers, a/k/a UM122, and to specifically pick up "two bucks," seemingly referring to a quantity of money. *Id*. Based on these and other calls, the agents concluded that Guerrero was directing Cornejo (along with another unidentified female courier) to pick up a load of drugs and/or money from Michael Childers,

a/k/a UM122, swap those drugs and/or money for the "14" fully processed

kilograms ready for pickup from UM637, and then possibly transport those

materials back to UM122. *Id*. at 57-58.

That same afternoon, a few minutes after this series of calls, S/A Boone saw

Cornejo get into a silver Ford Fusion, driven by another woman, which then

travelled to an auto shop associated with Childers a/k/a UM122.  *Id*. at 44, 59-62.

Agents also intercepted a call from Cornejo stating that she was parking at

"Meca's," which was a term believed to refer to Childers/UM122. *Id*. The Fusion

then travelled to a residence in Ellenwood, Georgia. *Id*. During the trip, agents

intercepted a call, in which Cornejo reported to Guerrero that she (Cornejo) was

arriving in 10 minutes for the delivery. *Id*. at 63.

Prior to the arrival of the Fusion at the Ellenwood location, agents

surveilling UM637's residence observed two individuals leave that location and

travel to the Ellenwood location. *Id*. at 62-64. Agents also saw from geolocation

data for UM637's phone that it was at the Ellenwood location. *Id*. at 68. According

to the testimony of S/A Boone, she understood from the information shared among

the agents on WhatsApp-based texts as well as verbally that the surveillance agents

saw the Fusion back into the driveway in Ellenwood and open the trunk.

According to S/A Boone, she understood that agents saw a man first retrieve a

large box from the trunk and then bring that box into the house, and then return to

place a different container from the house into the trunk of the Fusion, at which point the Fusion drove off. *Id*. at 64-65.

The Defendant specifically challenges whether any agents actually saw anything placed *into* the Fusion. Defendant notes that while the WhatsApp text record includes a contemporaneous statement from an officer stating, "Walked in with Huge box she got out of the trunk," Ex. 5, 3/18/20, 4:27:21 pm, there is no similar text reporting an observation that anything was placed *into* the trunk. To the contrary, Defendant cites a text from officer Michael Henao asking, "Stay with the car until gets pulled over. Did anything got [sic.] into into [sic.] it?" Ex. 5, 3/18/20, 4:30:33 pm. It is undisputed that there was no responsive text from any surveilling officer. Nevertheless, S/A Boone testified that the absence of such a text does not refute her recollection that someone reported seeing an object being placed into the truck, because the agents did not exclusively communicate by text. They communicated also by radio and by calls. *Id*. at 65-66.

Regardless, after the Fusion left the Ellenwood location, the officers intercepted another call, in which Cornejo reported to Guerrero that the transaction (that was seemingly observed at the Ellenwood location) was completed and they further discussed the payment due to the courier driving the car. *Id*. at 66-67. Specifically, Guerrero instructed Cornejo to give a total of $2,000 to the courier. *Id*.

Subsequently, GSP Trooper Anthony Munoz, who had been part of the team and part of the communication chain, was asked to stop the Fusion. According to Munoz, he believed that he had the legal right to stop the vehicle based simply on the information he had been told about the Fusion's involvement in an apparent drug trafficking transaction. Tr. at 115. Munoz specifically believed based on what had been reported to him that the agents suspected drugs to be within the car. *Id*. at 126-127.

Nevertheless, Munoz also determined that the vehicle was speeding (traveling at approximately 45-50 miles per hour in a 40 mile per hour zone), and ostensibly pulled the Fusion over for that additional reason. *Id*. at 96. Munoz determined the Fusion's speed by "pacing" it with his own car, that is, by "match[ing] my vehicle speed to the vehicle that I'm watching and just keep[ing] the same time and distance." *Id*. at 96. Munoz did not use radar or any other speed detection device (other than his own vehicle's speedometer). *Id*. at 111. Munoz's car has a video recording system that he can manually activate at any time, and which automatically activates and begins recording when the blue lights are turned on. This system also will maintain 15 seconds of recorded video preceding the initial activation of blue lights. *Id*. at 111-112. However, Munoz neither manually activated this system nor turned on his blue lights within enough time to cause the video recording system to capture any of the time when Munoz was "pacing" the

Fusion. *Id*. Munoz initiated the stop at 4:40 pm. Tr. at 67-68, 95-97. A few minutes later, at approximately 4:44 pm, the agents intercepted a call from UM637 informing Guerrero that he (UM637) had received the delivery and "two bucks," had to check the temperature of the product, and that he (UM637) had sent "14." *Id*. at 67-68; Gov't Ex. 3L at 2282-83. S/A Boone believed that the reference to "14" meant that UM637 had provided Cornejo and the other courier with the 14 kilograms of finished methamphetamine that Guerrero had previously explained was to be provided to UM122/Childers. *Id*. at 67-69. The agents shared this conclusion on the WhatsApp chat at 4:47 pm. *See* Gov't Ex. 5 at 9 ("Per Kali and Um637 Maria [Cornejo] has product.")

At the traffic stop, Trooper Munoz directed both Cornejo and Defendant Hernandez (the driver of the Fusion) to leave the vehicle. Tr. at 99-101. Hernandez did not have a valid driver's license. *Id*. Munoz requested consent to search the Fusion, but neither Hernandez nor Cornejo agreed. *Id*. at 102-103.

Meanwhile, GSP K-9 Trooper Kendall Stanley, who had also been part of the GSP team supporting this operation, arrived at the scene with his drug detection dog, Ozon. Tr. at 98, 139. Ozon received six weeks of initial training, and then ongoing monthly training, and has been certified to identify the odor of methamphetamine and other narcotics. *Id*. at 134-136. Trooper Stanley testified that he has personally observed Ozon perform over 200 searches for narcotics in

the field and in training. *Id*. at 141. After the Defendants denied consent to search, Stanley deployed Ozon. *Id*. at 140, 150-151. Stanley brought Ozon to the front of the car but Ozon immediately pulled towards the driver's side door, which was still open from when Munoz had instructed Hernandez to exit. *Id*. at 140-142, 150-151. Ozon briefly poked his head into (but did not otherwise enter) the open car door and positively alerted to the smell of narcotics. *Id*. Subsequently, Munoz and Stanley searched the car and found 14 gallon-sized bags of a substance believed to be methamphetamine in a container in the trunk. *Id*. at 103.

Before initiating the search, Munoz began questioning Defendant Hernandez about whether there were any drugs in the car. Tr. at 118-119. As part of this discussion, Munoz also asked Defendant about her children, and stated things like "[b]ecause if there are drugs in the car, you are going to go away for a very long time," and "your kids will have kids before you get out." *Id*. Munoz did not provide any *Miranda* warnings during this discussion. According to Munoz, while Defendant was not free to leave because the investigative stop was still underway, she had not yet been arrested during this time. *Id*. at 118-120.

Subsequently, after the methamphetamine was found in the trunk, DEA Task Force Officer Henao (who had arrived on the scene) arrested Cornejo and Hernandez. *Id*. at 169. Henao, who speaks English and Spanish, took Defendant to a car and issued *Miranda* warnings from his DEA-issued form. *Id.* at 174-176;

Gov't Ex. 9. Henao stated that Defendant's truthful cooperation could benefit her and that the agents would inform the prosecutors of such cooperation. Tr. at 177-179, 194-195. Defendant in response indicated that she was willing to answer questions without a lawyer. Tr. at 177. According to Henao, Defendant answered his questions, but she appeared to be evasive and to minimize her knowledge or involvement. *Id*. at 179-180. She changed her answers, first saying that she knew what she was transporting, and then claimed that she did not know. *Id*. She stated that she thought it was only money that she would be picking up. *Id*. She also at one point claimed that she had only driven for Cornejo one other time, and then changed that to say that she had done it twice. *Id*. She stated that she was paid $1,000 for a prior episode. *Id*.

## II.    DISCUSSION

### A. *The Stop and Search of the Fusion*

Defendant argues that Trooper Munoz lacked probable cause or even reasonable suspicion to stop her car. Defendant argues that the Court should reject Trooper Munoz's claim as to a purported speeding violation as unsupported and that the officers lacked enough facts based on the surveillance and phone intercepts to believe that narcotics were likely in the car. Even if the Trooper had reasonable suspicion to justify stopping the car, Defendant argues that the Trooper unreasonably extended the traffic stop beyond any justifiable purpose. Defendant,

finally, argues that the Government has not established that the canine search was

reliable, and that this search in any event involved a clear trespass in violation of

Defendant's Fourth Amendment rights. On all of these bases, the Defendant argues

that the seizure and/or search of her Fusion was unconstitutional and the fruits

thereof should be suppressed.

1. *Legal Standards*

The Fourth Amendment to the United States Constitution protects the right

of persons to be free from unreasonable searches and seizures.  U.S. CONST.

AMEND. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and

seizures inside a home [or other private property] without a warrant are

presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980);

*United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000).  Upon a motion to

suppress evidence garnered through a warrantless search and seizure, the burden of

proof as to the reasonableness of the search rests with the prosecution.  *United*

*States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (*citing United States v.*

*Impson*, 482 F.2d 197 (5th Cir. 1973)). Thus, the government must demonstrate

that the challenged action falls within one of the recognized exceptions to the

warrant requirement, thereby rendering it reasonable within the meaning of the

Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v.*

*Jeffers*, 342 U.S. 48, 51 (1951).

Under the automobile exception, a warrantless search of a car is constitutional if the car is "readily mobile" and probable cause exists to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). Probable cause exists to conduct a warrantless search when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances. *United States v. Tamari*, 454 F.3d 1259, 1261–62 (11th Cir. 2006) (quotations omitted). Probable cause requires more than a mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (*quoting Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

Probable cause is not required to justify a mere investigative stop, however; reasonable suspicion is sufficient for that purpose. *United States v. Powell*, 222 F.3d 913, 917-918 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-475 (11th Cir. 1996).  Specifically, to briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity, including traffic violations.  *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470 U. S. 675 (1985). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate

and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-124 (2000) (*quoting Terry*, 392 U.S. at 27).

A traffic stop based on reasonable suspicion can escalate into a finding of probable cause justifying a search under the automobile exception, based on facts obtained during the stop. For example, probable cause can arise based on a positive alert by a dog specially trained to detect the odor of narcotics. *United States v. Dunkley*, 911 F.2d 522 (11th Cir. 1990); *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006). The courts have made clear that the use of a drug detection dog to sniff the open air in a public place (such as that around a vehicle sitting in the parking lot of a store open to the public) is not itself considered to be a search for Fourth Amendment purposes. *See United States v. Place*, 462 U.S. 696, 707 (1983) (use of a "canine sniff" by a trained narcotics dog is not a search within the meaning of the Fourth Amendment because it is much less intrusive than a typical search); *Hearn v. Bd. Pub. Educ.*, 191 F.3d 1329, 1332 (11th Cir. 1999) ("A dog sniff of a person's property located in a public place is not a search within the meaning of the Fourth Amendment.").

The Court, however, is not required to blindly accept the conclusory assertions as to the results of a canine search. While there is no specific litmus test by which to consider the probative value of a canine "open air sniff", the Court must generally consider the dog's training and other evidence of the reliability of

the alert in the totality of the circumstances. *See Florida v. Harris*, 133 S.Ct. 1050, 568 U.S. 237 (2013).

Whether a detention or search is based on requisite levels of knowledge can in appropriate cases be viewed in light of the "collective knowledge" doctrine. This doctrine allows a court to impute the knowledge of one or more other officers to the one who specifically engages in the search or other conduct at issue. *See, e.g., United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."). The collective knowledge of officers may be considered "if they maintained at least a minimal level of communication during their investigation." *Willis*, 759 F.2d at 1494.

2.  *The Application of the Automobile Exception*

The Defendant does not contest that the Fusion met the readily-mobile prong of the automobile exception, and the facts are clearly adequate to meet this easily-met factor. Defendant also does not contest that the level of communication that included Trooper Munoz was sufficient to apply the collective knowledge doctrine, and that the determination of probable cause and reasonable suspicion is

appropriately based on the collective knowledge of all of the officers involved in the operation (including S/A Boone).

Defendant's primary challenge, rather, is to whether the facts known to the officers rose to the level of reasonable suspicion and/or probable cause. The Court disagrees with Defendant, however, on these points. The Court finds that the officers immediately prior to the traffic stop had at least reasonable suspicion that the occupants of the Fusion had been involved and continued to be involved in drug trafficking. To the extent the Troopers did not already have probable cause to believe that evidence would likely be found within the car, that standard was met within just minutes of the investigative stop.

As explained above, the officers knew based on the calls intercepted between Guerrero, Cornejo, UM122/Childers, and UM637 that Cornejo (and an unknown female courier) were planning to transport a load of material that was likely to include narcotics that day. The officers knew enough to piece together various apparent details of that plan, including that Cornejo and the courier would first arrive and pick up a load of narcotics from UM122/Childers and deliver that load to UM637. The officers through physical and electronic surveillance and telephone intercepts confirmed these exact movements: they saw Cornejo and the courier driving (in the Ford Fusion) to UM122's shop; they saw the suspects subsequently drive to a residence where UM637 was believed to be present (based

on his geolocational tracking information); the officers saw a large container being taken out of the trunk of the Fusion and brought into that residence; and they intercepted a subsequent call from Cornejo to Guerrero reporting that the transaction was successful and discussing the plan to pay the courier (the Fusion driver) $2,000. These facts were more than sufficient to at least establish reasonable suspicion that the Fusion and its occupants had just been involved in, and were still involved in, a drug trafficking transaction. At a minimum, an investigatory stop was permitted on these facts.

But the officers also knew more. S/A Boone specifically testified that surveillance officers reported seeing a large container being placed *into* the trunk of the Fusion before it left UM637's location (very shortly before the traffic stop). Defendant asks the Court to disregard this statement because it is not corroborated by any contemporaneous text in the WhatsApp record. But S/A Boone explained that the information from the surveilling agents was being transmitted in a variety of ways, including by oral statements by phone, and not just by text. In any event, even if there were ambiguity about whether any agent could see anything placed into the trunk, the agents already knew from the phone intercepts that the plan involved a delivery *to* UM122/Childers from UM637, of an amount of apparent methamphetamine referred to by the quantity "14," apparently in exchange for the drugs being provided to UM637. Consistently with this understanding, almost

immediately after the traffic stop, the agents intercepted another call in which UM637 reported to Guerrero that he had received the delivery (apparently from Cornejo in the Fusion), and had in turn sent "14," presumably referring to the previously-discussed plan to send "14" back to Childers. Thus, the agents contemporaneously noted, just a few minutes into the traffic stop, and before any search of the car, that "[p]er Kali and Um637 Maria [the Fusion passenger] has product." *See* Gov't Ex. 5 at 9.[2]

Thus, even without express surveillance confirmation, these facts established a reasonable probability that the Fusion was carrying narcotics, as well as other potential evidence including money. Indeed, Cornejo and Guerrero specifically discussed the plan for Cornejo to pay Defendant Hernandez, the driver of the Fusion, $2,000 after they left the transaction with UM637. As noted above, neither reasonable suspicion nor even probable cause require certainty. The Court finds that the facts summarized above satisfy these standards.[3]

---

[2] As this call was intercepted after the traffic stop, it obviously cannot contribute to the reasonable suspicion that justified the stop. But the Court easily finds that Trooper Munoz had at least reasonable suspicion of the Fusion's involvement in drug trafficking based on the other facts discussed above, and the intercepted call would have further contributed to probable cause to justify the search.

[3] Because the Court finds that Trooper Munoz had at least reasonable suspicion of drug trafficking activity to justify the traffic stop, it is immaterial whether he also had a basis to stop the Fusion for speeding. It is also immaterial whether Trooper Munoz unreasonably elongated the duration of the stop beyond what was necessary to address the speeding violation alone. The facts suggesting possible drug

The Court finds that the officers had probable cause to believe that drugs and money would be present in the car, irrespective of Ozon's positive drug sniff. However, the Court also finds that the drug sniff independently established probable cause. Defendant argues that Ozon's detection was not reliable. However, the Supreme Court has stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

*Harris*, 568 U.S. at 246-47.

Here, the Government has introduced evidence that Ozon and Stanley successfully completed ongoing training and that Ozon had been certified to detect odors of methamphetamine and other narcotics. *See.* Tr. at 134-142; Gov't Exs. 6-7. Defendant criticizes this training and Stanley's methods. Defendant, for example, questions the training practice by which Ozon was typically presented with at least one vehicle that contained drugs among several others that did not. Defendant posits that this practice conditions dogs to always expect that drugs are present somewhere, and any training should have instead included instances where no drugs were present at all. Defendant also criticizes Stanley's practice of giving

---

trafficking activity were more than enough to justify the relatively brief delay between the stop and the canine sniff and other events.

ordinary praises to the dog whenever the positively alerts, which Defendant argues would naturally encourage a dog to give positive alert.

While Defendant offers her lay opinion as to the inadvisability of these practices, she offers no evidence to suggest that these procedures failed to comply with any training or any industry standards. Nor does Defendant offer any expert opinion testimony suggesting that such procedures are inherently unreliable. Indeed, Stanley explained that while he might say "good dog" after Ozon alerts, Stanley only gives the more substantial reward of a physical treat or toy if Ozon's alert is accurate. Stanley also explained that during training exercises Ozon is generally confronted with many vehicles or other potential hiding spots that have no narcotics inside, alongside some that might have narcotics.

While Stanley acknowledged that Ozon has had some incorrect alerts among his hundreds of deployments and training exercises, evidently the dog's record has been sufficiently reliable to maintain his certification. In the end, the Court finds no basis to reject the canine sniff evidence in this case, based on a trained and certified drug detection canine, as unreliable. As noted above, probable cause requires only *probability* not certainty. Based on the totality of the facts, the Court finds that Ozon's alert was sufficient to meet this standard.[4]

---

[4] Defendant also argues that a positive alert would not have justified a search in this case, because according to Defendant the agents had just seen a container of likely narcotics taken out of the car. Defendant speculates that a positive alert could have

A separate, more difficult, issue is presented by Ozon's alleged nasal trespass. Specifically, Ozon only alerted after having poked his nose into the open door of the Fusion, which had been left open after Munoz ordered Hernandez to exit. Defendant argues that probable cause to justify a search under the automobile exception cannot be predicated on a canine search that trespassed into Fourth Amendment-protected space. Defendant analogizes to the Supreme Court's decision in *Florida v. Jardines*, 569 U.S. 1 (2013), which invalidated an open-air canine sniff that took place immediately outside of a residence on Fourth Amendment-protected curtilage.

The Government, however, cites several cases that more closely address this situation, that is, where a drug-detection dog enters an open door of a car. These cases generally stand for the proposition that because dogs are instinctual animals, suppression is only warranted if the officers themselves encouraged the dog to enter the car or facilitated the search by opening the door.

---

simply been based on lingering odor from this previously-transported package and did not necessarily suggest the *current* presence of drugs. The Court cannot accept this logic. That the agents actually saw the Fusion engaged in a drug delivery only strengthens probable cause. The agents were not required to assume that no more drugs remained in the car after the delivery to UM637, and the Court cannot speculate that Ozon would have still alerted based on simply the historical presence of narcotics. Further, as explained above, the agents were aware of specific facts through the surveillance and the intercepts suggesting that the Fusion contained "product," in the amount of "14," from UM637 to UM122.

In *United States v. Stone*, 866 F.2d 359, 363-64 (10th Cir. 1989), the driver of a car stopped by the police opened the car's hatchback trunk to comply with the officer's instruction to retrieve paperwork that was in the trunk. The trunk remained open, and several minutes later a drug detection canine that had been deployed to conduct an open-air sniff around the vehicle affirmatively jumped in and alerted to the presence of drugs. The court found that suppression was not warranted because the dog acted on its own instinct and there was no evidence that the officers guided it or otherwise caused the door to be open to facilitate the search. *Id*.

Another panel of the same court subsequently distinguished *Stone* and suppressed the results of a canine sniff in *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998). In that case, the officers had themselves opened the side door of a van for purposes of looking inside, kept the door open, and later allowed a drug detection dog off his leash outside of the car. Unsurprisingly, the dog jumped into the open side door, and then gave a positive alert for the presence of drugs. On these facts, the 10th Circuit found that the officers' actions allowed the dog's trespass for purposes of facilitating the search, which warranted suppression.

These and the other cases cited by the Government on the issue of canine entry into open vehicles are persuasive. The Court agrees that suppression would not be warranted unless there is sufficient action attributable to the human beings

participating in the search, as dogs are not capable of being deterred by the prospect of the exclusionary rule. How that should apply here is a close issue, but in the end the Court does not find the level of affirmative human action that would justify suppression, such as existed in *Winningham*. The driver's door may have been left open from when Munoz ordered Hernandez out of the car, but there is no evidence to suggest that Munoz took that action to facilitate the search. To the contrary, Munoz testified that it is standard procedure to order the driver out of the car during an investigatory stop of this nature, to prevent flight and the possibility of a chase and to thereby protect public safety. *See* Tr. at 99.

*Jardines* is not to the contrary. The Supreme Court in that case based on its decision on the volitional action of the officers themselves, who were the ones who brought a canine detection dog onto protected curtilage, that is, the front porch of a residence. In this case, Stanley brought Ozon to the side of an open parking lot or roadway in which Defendant had no expectation of privacy. At that point, Stanley explains (and it appears on the video footage, Gov't Ex. 1) that Ozon pulled of his own volition and happen to poke his nose briefly into the open car door. The Court does not find a Fourth Amendment violation or the propriety of suppression of evidence on these facts.

Nevertheless, this issue is a closer call, and there is no question that it would have been better practice for Munoz or Stanley to shut the door (or ask the driver

to do so) prior to the open-air sniff. For that reason, the Court emphasizes that resolution of this issue would be moot to the extent the officers otherwise had probable cause to believe the car contained narcotics, as the Court has found.

For all of these reasons, the Motion to Suppress Evidence should be denied in its entirety.

B. *Defendant's Statements*

Plaintiff separately moves to suppress any statements she made to Munoz or Henao as having been made in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and as having otherwise been made involuntarily.

1. *Legal Standards Regarding Suppression of Statements*

In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that when a defendant objects to the introduction of a statement to law enforcement as involuntary, due process requires the trial court to make an independent determination that the statement was voluntary before it may be heard by the jury. A two-part inquiry determines the admissibility of a self-incriminating statement. First, the court must consider whether the Government complied with the requirements of *Miranda*. Second, the court must consider whether the statement was voluntary. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994).

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the

assistance of counsel prior to any interrogation by law enforcement. The

Government has the burden to show the knowing and intelligent nature of a

*Miranda* waiver. *Id.* at 475. The Supreme Court instructs courts to look for two

things:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it. Only if
> the totality of the circumstances surrounding the interrogation reveal[s]
> both an uncoerced choice and the requisite level of comprehension may
> a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation

omitted).

The right to Miranda warnings attaches when custodial interrogation begins.

*United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). The Supreme Court

in *Miranda* explained that "custodial interrogation" means "questioning initiated

by law enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant way." 384 U.S. at

444. The Court subsequently defined "custody" in this context as a "formal arrest

or restraint on freedom of movement of the degree associated with a formal arrest."

*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted). It is

the Defendant's burden to demonstrate that he or she was in "custody" during

questioning and that *Miranda* thereby even applies. *See United States v. de la*

*Fuente*, 548 F.2d 528 (5th Cir. 1977)[5]; *see also United States v. Peck*, 17

F.Supp.3d 1345, 1353-55 (N.D.Ga. 2014) (Totenberg, J.)

    2. *Certain of Munoz's Questioning Violated Miranda*

It appears from the dashboard video, Gov't Ex. 1, that Defendant was with

Munoz for approximately the first hour of the encounter. During this time, among

other things, Munoz engaged in initial questioning about Defendant's identity,

investigatory questioning about whether there would be drugs found in the car,

questioning about Defendant's children and family in the context of the severity of

potential charges, and he provided commentary about the results of the canine

search and his observation that Defendant (and Cornejo) were "in big trouble" (at

approximately minute marker 18:00). Munoz also ultimately engaged in a series of

disturbing questions and comments (at approximately minute marker 58:00) about

whether, among other things, this was Defendant's "first time" being a drug

courier and whether "they" "paid her" enough.

It is undisputed that the Defendant was not provided proper *Miranda*

warnings during any of this discussion.[6] The Government's sole argument,

---

[5] The Eleventh Circuit has adopted as binding precedent all published decisions rendered by the U.S. Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).
[6] At approximately minute marker 18:00-19:00, Munoz told Defendants words to the effect that "you don't have to talk," but that "now is a good time to talk if you want to." This advisement clearly did not in itself satisfy *Miranda* and the Government does not contend otherwise.

relegated to a footnote, is that *Miranda* did not apply to Munoz's questioning

because Defendant was not formally arrested, and therefore not "in custody," until

afterwards. Defendant, rather, argues that she was effectively in custody for most if

not all of the incident, because a reasonable person in her position would not feel

free to leave.

Both sides have it a little bit wrong. The touchstone of being "in custody" for

purposes of *Miranda* turns neither on whether a suspect feels "free to leave" nor on

whether she has actually been arrested. The standard lies in the middle. The

Supreme Court has provided a non-exhaustive list of factors courts should

consider:

> As used in our Miranda case law, "custody" is a term of art that
> specifies circumstances that are thought generally to present a serious
> danger of coercion. In determining whether a person is in custody in
> this sense, the initial step is to ascertain whether, in light of "the
> objective circumstances of the interrogation," Stansbury v. California,
> 511 U.S. 318, 322–[ ]23, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293[ ]
> (1994) (per curiam), a "reasonable person [would] have felt he or she
> was not at liberty to terminate the interrogation and leave." Thompson
> v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).
> And in order to determine how a suspect would have "gauge[d]" his
> "freedom of movement," courts must examine "all of the
> circumstances surrounding the interrogation." Stansbury, supra, at
> 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant
> factors include the location of the questioning, see [Maryland v.]
> Shatzer, [559 U.S. 98, 110–17], 130 S.Ct. [1213], 1223–[ ]26, 175
> L.Ed.2d 1045 [ (2012) ], its duration, see Berkemer v. McCarty, 468
> U.S. 420, 437–[ ]38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984),
> statements made during the interview, see [Oregon v.] Mathiason,
> [429 U.S. 492], 495, 97 S.Ct. 711, 50 L.Ed.2d 714 [ (1977) ];
> Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158

L.Ed.2d 938 (2004); Stansbury, supra, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, see New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see California v. Beheler, 463 U.S. 1121, 1122–[ ]23, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of Miranda. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, Berkemer, supra, at 437, 104 S.Ct. 3138, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. "Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Shatzer, 559 U.S. at ——, 130 S.Ct. at 1224.

*Howes v. Fields*, 565 U.S. 499, 508-509, 132 S.Ct. 1181, 1189–90, 182

L.Ed.2d 17 (2012); *see also United States v. Luna–Encinas*, 603 F.3d 876, 881

(11th Cir. 2010) (explaining that "although a reasonable person in the defendant's

position may feel constrained not to leave the scene of a police encounter at a

particular moment—and thus may be deemed to have been 'seized' by law

enforcement—he will not necessarily be considered in 'custody' for Fifth

Amendment purposes.... Rather, 'a free-to-leave inquiry reveals only whether the

person questioned was seized.' ... While 'seizure is a necessary prerequisite to

Miranda, ... a court must [also] ask whether ... a reasonable person would have

understood his freedom of action to have been curtailed to a degree associated with

formal arrest.'") (citations omitted).

In other words, being subjected to a mere investigatory detention does not usually rise to the level of being "in custody" for purposes of *Miranda*, even though suspects being so detained are not free to leave. The question therefore is at what point during the encounter with Trooper Munoz would a reasonable person in Defendant's position would have understood that she was likely being *arrested*, not just briefly detained.

Based on the testimony and a review of Trooper Munoz's dashboard camera recording (Gov't Ex. 1), the Court finds that the encounter crossed that line into being akin to a formal arrest, at least from Defendant's viewpoint, at approximately the 18:00 minute mark. At this point, Stanley had announced that Ozon had alerted to the presence of drugs, the officers engaged in the search of the Fusion, Trooper Munoz found the large container holding suspected methamphetamine in the trunk, and he turned to the Defendants and said, "you guys are in big trouble." A few minutes earlier, Munoz had asked the Defendants whether drugs were in the car and noted that, if drugs were found to be in the car, the applicable sentence could be so high that their "children would have children" before the Defendants were released. The Court finds that at the time of those earlier comments, the encounter remained investigatory in nature and a reasonable suspect would not yet perceive that they were effectively under arrest. But in combination with the later discovery of drugs and additional advice that "you guys

are in a lot of trouble," the line into an arrest, for all intents and purposes, was crossed.

There is no question that Munoz interrogated Defendant after that juncture and the Government's footnote denying any *Miranda* issue vis-à-vis the Munoz encounter does not argue otherwise. After roughly the 57:00-58:00 minute timeframe, for example, Munoz directly asks Defendant whether she's been a drug courier before, and how much she was being paid. Seemingly understanding that these questions constituted custodial interrogation, Munoz can also be heard on the recording asking another officer if Defendant had been read her rights. But the answer is not audible and the Government has elicited no evidence to show that Defendant had been furnished and waived her *Miranda* rights by this point. What the Defendant said in response to these inappropriate questions by Munoz is not entirely audible, and it does not seem that she offered more than brief, cursory denials. But anything she may have said in response to Munoz's questioning during this timeframe would have been obtained in violation of *Miranda*.

Thus, the Court recommends that the Motion to Dismiss Statements be granted insofar as it applies to any statements by Defendant to Munoz after his comment, "you guys are in big trouble," at the 18:00 minute mark of the recording (Gov't Ex. 1), which statements were elicited in violation of *Miranda*.

3. *Post-Miranda Statements to Henao*

After the initial interactions with Munoz, DEA TFO Henao took custody of Defendant, and finally provided her with *Miranda* warnings. Defendant argues that Henao's subsequent questioning was nevertheless improper, for two reasons, First, Defendant argues that while she was furnished her *Miranda* warnings, the record does not show that she waived those rights before Henao subjected her to questioning. Second, Defendant argues that any waiver was involuntary, because it was tainted by improper threats and inducements from both Henao and Munoz.

As to the first issue, it is true that after reading Defendant her rights, Henao never expressly asked, in so many words, "do you waive these rights," and Defendant never expressly said "I waive my rights." But the government "does not need to show that a waiver of Miranda rights was express," and "an implicit waiver" of the Miranda rights is sufficient. *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 2261 (2010); *Hall v. Thomas*, 611 F.3d 1259, 1285 (11th Cir. 2010).

Here, it is undisputed that Henao went over Defendant's rights with her, including with use of a written form, and that she acknowledged that she understood those rights. Henao subsequently asked Defendant whether she would be willing to talk to him (Henao), Defendant responded in the affirmative, and she then answered questions. Henao testified, and Defendant does not dispute, that

Defendant never requested a lawyer or invoked her right to remain silent. This record was a sufficient basis for Henao to proceed.

As to the second issue, Defendant's implicit *Miranda* waiver, and willingness to talk to Henao, was not rendered involuntary by Henao's and Munoz's statements about the severity of the offense and possible benefits of cooperation. A mere statement by the police to an accused that her cooperation would be passed along to judicial authorities and may be beneficial to her is not the sort of promise or inducement that would vitiate the voluntariness of subsequent statements or waivers. *United States v. Mercer*, 541 F.3d 1070, 1075-1076 (11th Cir. 2008); *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985). Nor does truthfully commenting on the potential severity of a sentence that a suspect may face generally lead to an involuntary waiver or statement. *See Davidson*, 768 F.2d at 1271. *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) ("[D]iscussions of realistic penalties for cooperative and non-cooperative defendants…are normally insufficient to preclude free choice.") (internal citation omitted).

The commentary that Defendant complains about from Henao—that truthful cooperation would be "beneficial" to Defendant and "go a long way once we talk to the prosecutor," *see* Def. Reply [288] at 19—and Munoz—that "your kids may have kids" by the time any potential sentence might expire, Def. Br. [282] at 10—

are akin to these sorts of statements that the Eleventh Circuit have found to be non-coercive. Defendant does not show any violation.[7]

   4. *Voluntariness of the Statements*

Separately from *Miranda*, the Government bears the burden to show that the Defendant's statements (whether the result of custodial interrogation or not) were made voluntarily. *See Jackson v. Denno*, 378 U.S. 368 (1964). Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the
> accused to an exhaustingly long interrogation, the application of

---

[7] Defendant does not specifically argue, and the Court does not find, that the post-*Miranda* statements to Henao should be suppressed because of the earlier *Miranda* violation by Munoz. Generally, a prior un-*Mirandized* statement does not taint a subsequent statement that is preceded by a proper *Miranda* warning. *See United States v. Lopez-Garcia*, 565 F.3d 1306 (11th Cir. 2009). In specific circumstances courts may find a violation, such as where the police deliberately scheme to circumvent *Miranda* by obtaining an un-*Mirandized* confession first, and then following that up with *Miranda* warnings and a repeat of the same questioning. *See Missouri v. Seibert*, 542 U.S. 600, 610-611, 124 S.Ct. 2601, 2608-2609 (2004). But Defendant does not make such an argument, and the Court does not discern such an issue. There is no evidence that Munoz and Henao coordinated this questioning to circumvent *Miranda*, or that anything Defendant volunteered in response to Munoz's un-*Mirandized* questioning induced her to make admissions to Henao. The record is unclear as to what if anything Defendant admitted to Munoz, and as far as the Court can discern from the recording (Gov't Ex. 1) it largely consisted of perfunctory denials. The Court perceives no probability that this minimal discussion impacted any decision to later agree to speak to Henao.

> physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Defendant largely repeats the same arguments on this issue. That is, Defendant argues that Munoz's discussion of a potentially lengthy sentence for any narcotics-trafficking charge along with Henao's references to cooperation being "beneficial" to Defendant, deprived her of an ability to make a free and voluntary choice to speak. As *Jones* explains, however, and as the undersigned has already discussed as to the related topic of whether Defendant's *Miranda* waiver was voluntary, these sorts of statements are not considered to be coercive.

The circumstances do not otherwise appear to be coercive. The officers' tone and physical actions appear to have been non-threatening. The questioning also does not appear to be exhaustively lengthy. Although Defendant was with Munoz for over an hour before being handed over to Henao for purpose of questioning, a review of the dashboard footage suggests that most of that time was spent quietly waiting while the officers processed the evidence and performed other tasks. There is no evidence that Defendant was denied any food, water or bathroom needs, and she was not handcuffed during this period. The evidence also does suggest that any weapons were unnecessarily displayed.

For all of these reasons the Court recommends that the Motion to Suppress Statements should be otherwise denied, except as to the un-*Mirandized* statements to Munoz described above.

### III.   CONCLUSION

As explained above, it is **RECOMMENDED** that Defendant's Motion to Suppress Evidence [127] be **DENIED.** It is also **RECOMMENDED** that her Motion to Suppress Statements [128] be **DENIED IN PART AND GRANTED IN PART**, as more specifically explained above. It is also **RECOMMENDED** that the Supplemental Motion to Suppress [242]—which is a consolidated motion appearing to re-state both the issues covered by the Motion to Suppress Evidence and Motion to Suppress Statements—also be **GRANTED IN PART AND DENIED IN PART**, to the same extent. In other words, all requests for suppression in any of these motions should be denied, except as to the statements to Trooper Munoz obtained in violation of *Miranda* as explained above.

Finally, the Court **DIRECTS** the Clerk to re-characterize the document currently mis-filed as another Motion to Suppress [282] as, instead, a post-hearing brief filed in support of the previously-filed motions [127][128][242].

IT IS SO **RECOMMENDED** this 28th day of January, 2022.


JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE